Filed 9/19/22 P. v. Melody CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H047978, H048612, H048638 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS121692A) |
| v. | |
| SEAN PATRICK MELODY, | |
| Defendant and Appellant. | |

## I.     INTRODUCTION

Defendant Sean Patrick Melody appeals after a jury found him guilty of two counts of aggravated kidnapping to commit extortion or to exact money or something valuable (Pen. Code, § 209, subd. (a); counts 1-2),[1] three counts of grand theft of a firearm (§ 487, subd. (d)(2); counts 3-5), and one count of grand theft of personal property (§ 487, subd. (a); count 6). The jury also found various firearm and great bodily injury sentence enhancement allegations true. The trial court sentenced defendant to life without the possibility of parole (LWOP) on count 1 consecutive to a life term on count 2. The court imposed a consecutive term of 19 years for the sentence enhancements on counts 1 and 2 and concurrent terms on counts 3 through 6.[2] After a restitution hearing, the court awarded victim restitution.

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] As detailed below, the court also sentenced defendant to a consecutive term in an Orange County case.

Defendant contends that the trial court erred when it failed to discharge a seated juror for cause; there is insufficient evidence to support the aggravated kidnapping convictions; the court failed to properly instruct the jury on aggravated kidnapping; the court erred when it refused to give a pinpoint instruction on robbery; he suffered cumulative prejudice from the instructional errors; the court erroneously admitted uncharged act evidence; the grand theft convictions were not filed within the statute of limitations; he could properly be convicted of only one grand theft; the punishment imposed on the grand theft conviction in count 6 must be stayed; his LWOP sentence is cruel and unusual; the determinate term is unlawful; he is entitled to additional custody credits for actual time in custody; the abstract of judgment must be corrected; and the restitution amount must be reduced.

The Attorney General agrees that the trial court erred in its imposition of the determinate term and that the restitution amount should be reduced; contends that remand for resentencing is necessary; and identifies errors in the abstract of judgment that should be corrected following resentencing. Regarding defendant's remaining claims, the Attorney General asserts that there was neither error nor prejudice.

For reasons that we will explain, we will reverse the judgment and remand the matter with directions to (1) strike the convictions on counts 4, 5, and 6 for grand theft; (2) correct the restitution order to $26,358.77; and (3) resentence defendant consistent with this opinion, including regarding selecting principal and subordinate terms and regarding concurrent and consecutive sentencing.[3]

---

[3] Defendant's appellate counsel has also filed a petition for writ of habeas corpus that this court considered with the appeal. We will dispose of the habeas corpus petition by separate order.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Trial Evidence*

#### 1. Background

Nathan Smith and Danny Barcinas were roommates in Marina. Smith worked in construction and Barcinas was a cashier at Save Mart. Smith and Barcinas kept drugs and guns in the house they shared. Barcinas also grew marijuana at a house down the street and sold marijuana, hash, and psilocybin. Smith helped set up the marijuana grow, and their mutual friend Jeff Lewis assisted with the grow.

Jerome Mantanona was related to Barcinas and had been to Barcinas's house. "[B]ad blood" developed between them when Barcinas caught Mantanona and another man robbing his house in 2005. The men took jewelry and marijuana. Barcinas reported the incident to the police. Afterwards, Mantanona went to the Save Mart and harassed Barcinas at work. Barcinas got a restraining order against Mantanona.

#### 2. Current Incident

On the evening of May 21, 2009, Smith, Barcinas, and Lewis had plans to go bowling. Sometime between 7:37 p.m. and 7:43 p.m., Barcinas noticed a male customer looking at him funny. The man was bald, stocky, and really tall. The man stared at Barcinas, turned away, and then stared again. Barcinas had never seen him before. The man used the self-checkout and left. Barcinas later identified the man as defendant.

At some point that night on May 21, 2009, Smith was at home and eating dinner alone when he heard noises in the front yard. Smith saw two men approaching. The men called out to ask if Smith's truck was for sale. Smith had never seen the men before. Smith later identified the taller of the two men as defendant.

Smith went out through the garage to talk to the men. The shorter of the two men came toward Smith, pointed a gun at him, and told him to get inside. Smith went into the garage with the two men following him. The men put Smith on the floor, closed the

3

garage door, and tied Smith's hands with a dog leash that was at the house. The men took Smith inside.

The men said that they knew Barcinas was at work and that they were waiting for him. They also asked Smith where the guns were. The men brought Smith to his bedroom, put him on the floor, took his shotgun, and told him to stay there.

Sometime later, Lewis arrived at Smith's and Barcinas's house just as Barcinas got home. Barcinas opened the garage door and noticed several boxes had been moved. Barcinas and Lewis went inside the house. Barcinas called out for Smith, but there was no response.

Lewis looked down the hallway and saw that Smith's feet were positioned as if he were face down on the floor. Barcinas approached Smith's room. As Barcinas got near the hallway, the man who was with defendant confronted Barcinas with Barcinas's shotgun. The man pointed the gun at Barcinas's face. Barcinas pushed the gun away and began fighting the man. Barcinas punched the man a couple of times, put him in a bear hug, and pushed him toward a bathroom next to Smith's room.

Lewis entered the hallway. Defendant smacked Lewis in the face with the barrel of a gun, busting his lip open. Defendant told Lewis to back up. Lewis backed into the living room while defendant kept the gun in his face. Defendant told Lewis to cooperate or he was going to shoot him. Defendant tied Lewis's wrists behind his back with a dog leash, had Lewis lie on the ground face down, and tied his ankles with another leash. Lewis was "hogtied on the living room floor."

Barcinas and the other man fought violently in the bathroom, breaking the toilet seat and some bathroom tile. They landed in the shower, with the other man beneath Barcinas. Barcinas bit the man and tried to knock him out by head butting him. When the man yelled for help, Barcinas felt a whack on the side of his head with a heavy object. Barcinas was struck three more times.

4

By this point, Smith had untied himself and saw defendant hitting Barcinas with a baseball bat. Smith got a different bat and tried to hit defendant. Defendant struck Smith on the top of his skull with the bat, knocking him unconscious.

Barcinas felt a gun placed to the back of his head. Defendant told Barcinas, " 'Either give up or I'm going to shoot you.' " Barcinas relented. Defendant brought Barcinas to the living room, where the other man and Lewis were located. Lewis was on the floor.

Defendant ordered Barcinas by gunpoint to go to the safe and open it. Barcinas walked toward the garage with defendant following him. Barcinas had blood gushing down the side of his head. When they got to the safe, defendant said, " 'No fun and games or I'm going to shoot your roommate,' [¶] . . . [¶] 'Or your friends.' " Defendant also said, " 'Open the safe for the first time or you're going to get it.' "[4] Defendant was pointing the gun at Barcinas. Barcinas opened the safe on the first try.

Defendant brought Barcinas to the living room by gunpoint and told him to get on the floor. The men tied Barcinas's hands behind his back with a dog leash. Barcinas asked for his medication because he thought he was having a heart attack. Defendant got Barcinas's pills and a glass of water. The other man kicked Barcinas two to three times on the side of his stomach. A few minutes passed and the men left, telling Barcinas, Smith, and Lewis to stay put or they would shoot them.

After a couple of minutes, Lewis untied himself. Lewis checked on Barcinas and Smith. Smith was not moving and had a big pool of blood around his head. Lewis called 911 and untied Barcinas.

Smith and Barcinas were taken by ambulance to the hospital. Smith had surgery for a fractured skull. Barcinas received staples to the top of his head. Barcinas had hair

---

[4] During a police interview the night of the incident, Barcinas told an officer that he was threatened, "[O]pen that safe on the first time or I'm going to shoot you," and, "[Y]ou better open this on your first try or your boys inside are going to get it."

stuck in his teeth from when he bit the shorter man during the struggle in the bathroom. Barcinas gave the hair to the police.

Smith's .357 Ruger revolver was missing from the safe inside the garage. Barcinas's Desert Eagle handgun, jewelry, and approximately $5,000 in cash were taken from the safe. Another shotgun belonging to Barcinas that was kept in a hallway closet was also taken.

### 3. Police Investigation

The DNA from the hair stuck in Barcinas's teeth matched Brian Zumbado's DNA. Zumbado was arrested in Los Angeles County in October 2012. Zumbado and defendant were placed in the same jail cell at the Huntington Beach Police Department.

Defendant and Zumbado were recorded talking in the jail cell. Defendant's first words to Zumbado were, "Oh man." Zumbado responded, "What the fuck's going on?" The men conveyed that they had each been arrested that day and had not talked to the police. Defendant stated that he was told that he was brought in for something that happened in Huntington Beach in 2007. Defendant said that he asked for a lawyer when he was told that they were charging him with attempted murder for something "up north."

During a police interview, defendant admitted that he knew someone named "Jerome," which was Mantanona's first name. Defendant denied that he had ever been to Marina. When the police told defendant that he was recorded on video surveillance footage at a Save Mart in Marina, defendant stated that he did not think that the store was in Marina. Defendant acknowledged that his wife had relinquished a Desert Eagle gun to the police in 2012. Defendant did not know the name of the man who sold the gun to him in 2009, but someone named "Danny" took him to the man's house to see it.

While investigating this incident, police found controlled substances in Barcinas's and Smith's house and located Barcinas's marijuana grow. Barcinas and Smith were charged with drug sales, pleaded guilty, and completed probation.

6

### 4. Prior Incident

In December 2007, a couple was robbed at their residence in Huntington Beach, Orange County. The couple was bound with zip ties and duct tape. The duct tape was sent to a crime lab for analysis. Defendant's DNA matched the DNA on the duct tape.

During a police interview, defendant stated that he got "the information on this guy" from someone called "Doc." Doc told defendant that the victim was a drug dealer. Doc "basically told [defendant] . . . that he has that stuff in there. So, um . . . go in there. Pretend like you're goin' into [*sic*] buy the pot."

Defendant stated that while Doc waited outside as a lookout, he and another man went to the victim's house, waited for him to come home, and confronted him at gunpoint when he pulled his vehicle into the garage with a woman in the passenger seat. Defendant and the coperpetrator wore masks, and the coperpetrator had a gun.

Defendant stated that he and the coperpetrator indicated to the man that they wanted to buy drugs. When asked by the police about the victim getting hit in the head and bleeding, defendant indicated that he did not hit the victim, and that if his coperpetrator hit the victim, the coperpetrator must have used the gun to do it. Defendant duct taped the man's mouth because he would not be quiet. Defendant also zip tied the man and duct taped the woman. Defendant demanded that the male victim "give us what we want." They got $2,000 in cash. Defendant did not remember whether a laptop computer, a camera, and watches were also stolen.

The parties stipulated that defendant was convicted of first degree robbery in concert in 2017.

### 5. Defense Case

Defendant did not present evidence on his behalf.

### B. *Procedural Background*

Defendant was charged by second amended information with the aggravated kidnapping of Smith for extortion (§ 209, subd. (a); count 1); the aggravated kidnapping

7

of Lewis for extortion (§ 209, subd. (a); count 2); three counts of grand theft of a firearm (§ 487, subd. (d)(2); counts 3-5); and one count of grand theft of personal property (§ 487, subd. (a); count 6). Regarding counts 1 and 2, it was alleged that defendant personally used a firearm within the meaning of section 12022.53, subdivision (b) and inflicted great bodily injury on Smith and Barcinas (§ 12022.7, subd. (a)). Regarding counts 3 through 6, it was alleged that defendant personally used a firearm within the meaning of section 12022.5, subdivision (a) and inflicted great bodily injury on Smith and Barcinas (§ 12022.7, subd. (a)).

A jury convicted defendant of all counts and found the sentence enhancement allegations true.[5]

Defendant moved for a new trial, which was denied.

The trial court initially sentenced defendant to LWOP on count 1 plus thirteen years for sentence enhancements; a consecutive life term on count 2 plus six years for sentence enhancements; and concurrent determinate terms of three years each plus ten years for sentence enhancements on counts 3 through 6. The court imposed a full-term consecutive sentence of nine years in the Orange County case where defendant was convicted of first degree robbery in concert in 2017. At a resentencing hearing, the court modified defendant's sentence in the Orange County case to a consecutive term of two years, which was one-third of the midterm.

After a restitution hearing, the court awarded $83,529.01 in restitution to Smith and $26,364.77 to Barcinas.

---

[5] Zumbado was convicted in a separate case of first degree robbery (§ 212.5, subd. (a)) with the personal use of a firearm (§ 12022.5, subd. (a)) and assault with a deadly weapon (§ 245, subd. (a)(1)). Zumbado was sentenced to 14 years.

# III. DISCUSSION

## A. *Failure to Discharge a Seated Juror for Cause*

Defendant contends that his Sixth and Fourteenth Amendment rights to an impartial jury were violated when the trial court failed to discharge a seated juror for cause. Defendant requested that the court dismiss Juror No. 4 after he disclosed that he recognized Barcinas during his testimony and knew him. The Attorney General contends that the court did not abuse its discretion when it declined to discharge the juror.

### 1. Trial Court Proceedings

During a break in Danny Barcinas's testimony on the first day of trial, the court informed the parties that it had received a note from Juror No. 4. The note stated, " 'I know Danny is a checker at our Lucky store in PG. We have a mutual friend who was our UPS driver who passed away from cancer. I never knew Danny's last name until now. And we do not and have not met socially. I do not feel my very casual relationship with Danny will affect my ability to serve.' "

With the prosecution and the defense present, the court questioned Juror No. 4 outside the presence of the other jurors, asking him if the only time he had seen Barcinas was at the Lucky store. Juror No. 4 stated that he only saw Barcinas at the Lucky store's checkout, and that "the only additional connection" he had with Barcinas was that they both knew a man who died of cancer about a year and half ago. The man was Juror No. 4's UPS driver who he "became very friendly with." Juror No. 4 believed that the man had been Barcinas's high school roommate. Juror No. 4 stated, "So Danny and I had conversations in the checkout line about Brian's passing and our relationship with Brian."

The court asked Juror No. 4 whether his contacts with Barcinas "mean he has any greater or lesser credibility than any other witness who's testifying here." Juror No. 4 responded, "Not at all." The court asked, "Due to the nature of his role in this case, being the alleged victim, do you feel that you will, perhaps, be more likely to vote guilty . . .

9

because you know [him]?" Juror No. 4 answered, "No, your Honor, I wouldn't. I'll weigh the facts as if I had never met Danny."

The court conferred with counsel off the record at the bench. The court then asked Juror No. 4, "Do you feel in any way you could be slightly biased towards this witness?" Juror No. 4 responded, "No. I don't feel that would be the case at all." The court inquired, "Do you feel you can be completely impartial and fair in this case?" Juror No. 4 answered, "Yes, I do." The court thanked Juror No. 4 and he left the courtroom. The court observed that the parties had not requested additional questioning of Juror No. 4.

Defendant stated that he had concerns about Juror No. 4 because "he's had multiple experiences with Danny Barcinas . . . [that] all appear to be favorable." The court responded, "Well, as favorable as going through a checkout in a grocery store can be. . . . [W]e've all had that experience." Defendant stated, "I would say it's actually a bit more than that, considering they bonded over another topic." Defendant continued, "The fact that they've talked about a mutual acquaintance, shared stories about that acquaintance, or whatever the case may be, I do have concern that he's not recognizing that he does have a more favorable opinion of [Barcinas,] who is a significant witness in this case, who is one of the main victims in the case. So I do actually have concerns about that."

The prosecution stated, "[T]he juror was credible in his description. He repeatedly insisted that it would not affect his decision, he would not be biased even a little bit. So I don't think there's any cause for removal."

The court took the matter under submission.

The court conducted follow-up questioning of Juror No. 4 at the start of the second day of trial. After the court confirmed that Juror No. 4 did not know Barcinas's last name before trial started, the court asked when he had last seen Barcinas. Juror No. 4 responded, "[O]ne day last week," and that he thought it was after jury selection had

10

begun but before he was seated as a juror. The court asked how long Juror No. 4 had been seeing Barcinas at the store. Juror No. 4 stated, "I want to say that . . . we first met when our mutual friend, Brian, was diagnosed with cancer. And I did not know Danny prior to that point. And I think the only reason I actually met him . . . , we actually heard him talk with [*sic*] my wife in line of . . . Lucky, and we actually heard him talk about Brian to another customer that was in front of us checking out. So prior to that, I didn't know Danny at all." Juror No. 4 explained that his wife told Barcinas that they knew Brian about a year to a year and a half ago. Juror No. 4 stated that he saw Barcinas "on a pretty regular basis" and would "run into him" approximately once a week. Juror No. 4 continued, "And then after Brian, pas[sed] our conversation[s] were simply, Thanks for the groceries, and that was it. And I, again, never socially met Danny outside of the store. We did not have a relationship in that way." Juror No. 4 stated that he had not seen Barcinas outside of the store until he saw him in the courtroom.

The court asked how often Juror No. 4 spoke with Barcinas after their friend's diagnosis, and Juror No. 4 responded that after their friend had died, which was around five to six months ago, he and Barcinas had "conversations for about two to three weeks about Brian's daughter. He had a younger teenage daughter. . . . [W]e would just talk about how she was doing with the whole thing. I want to say probably in the last four months or so, we haven't spoken about that situation at all. Just been more just, you know, hi and bye in the store." The court asked whether Juror No. 4 would select Barcinas's checkout aisle when shopping. Juror No. 4 responded, "No. I'm all about the shortest line when I'm shopping." The court inquired how long Juror No. 4 had seen Barcinas at the store, and the juror stated that it had been about a year and a half since he first met him.

The court asked, "[D]o you feel, given your contact with [Barcinas] in the past that you can treat him the same as any other witness? For example, not giv[e] him any greater or less credibility than any other witness?" Juror No. 4 answered, "With Danny, again, I

11

thought about it, your Honor, when I was sitting out in the hallway after seeing him prior to having the first conversation in the courtroom here about Danny, and my only thought when I first saw him walk in is, first, I want to make sure I recognized him. I wasn't [a] hundred percent sure. I haven't seen him out of that environment in the store. [¶] . . . [¶] And once I was sure about that, my only thought about Danny was, you know, bummer this happened to him, things I heard happened to him in the courtroom here, but I had no ill thoughts or different thoughts about [defendant]. I mean, my feeling is that I just want to sit here and listen to the facts and make the best decision based on those facts. And as I mentioned to you last week, I don't feel like my casual relationship with Danny is going to affect that decision-making process at all."

The court asked Juror No. 4 whether he could follow the jury instruction "about the credibility of witnesses, everyone kind of starts from the same spot? Can't have any biases toward or against any witnesses," and Juror No. 4 said that he could. The court inquired, "[D]oes [Barcinas] start the same as every other witness who is going to testify here, again with no greater other lesser credibility in your mind?" Juror No. 4 responded, "Yes, he does." The court asked about Juror No. 4's statement, "Bummer, this happened to him," and whether Juror No. 4 had made up his mind about defendant's "potential guilt and whether . . . he is the one that did this to . . . Barcinas or if this happened the way it's alleged." Juror No. 4 answered, "No, I have not, your Honor." When the court asked if he could wait until deliberations to make up his mind, he said that he could. The court excused Juror No. 4 from the courtroom and indicated that neither party had requested any additional questioning.

Defendant asked the court to discharge Juror No. 4 because Barcinas was "a significant witness" and "one of the three main victims . . . and frankly probably the main witness in terms of the whole narrative." Defendant acknowledged that Juror No. 4 "feels he can be unbiased, but the fact that he even made a statement, 'Bummer that happened to him,' suggests that he's already given [Barcinas] more credibility than

12

he realizes . . . , which makes him, in our minds, kind of a dangerous juror as well." Defendant stated that it was not Juror No. 4's fault, but had he known this information, he "probably would have exercised a peremptory [challenge] on him if the [c]ourt would not have kicked him for cause." Defendant asked for "an extra peremptory" to use against Juror No. 4 if the court was not going to dismiss him for cause.

The prosecution stated that there was no cause to discharge Juror No. 4 as he "repeatedly and credibly indicate[d] that he can set aside his minimal prior relationship with . . . Barcinas, and that he would follow all the [c]ourt's instructions about how he has to wait to make up his mind and deliberate. [¶] He had the opportunity to reflect on this over the weekend, and he's still just as convincing in his ability that he can follow his duty and responsibility."

The court declined to discharge Juror No. 4. It began its ruling by discussing the case law that it had reviewed, and observed that while section 1089 vests the court with the authority to discharge a juror, the case law was clear that a juror's inability to perform his or her duties must " 'appear in the record as a demonstrable reality.' " The court found that "[g]iven the short period of time that an individual would speak to a checkout cashier at a grocery store, certainly given Juror No. 4's ability to follow the Court's instruction, I don't think he wavered at all in whether he could still follow the Court's instruction and be fair in this case, and he had the weekend to think about it, . . . he seems to be a straightforward, credible person, his body language, demeanor, everything else indicates to the Court he's being honest, and he's not trying to hide anything. In fact, he's the one who told us he recognized . . . Barcinas. So I don't think in this case it rises to the level of warranting him being excused under [section] 1089. [¶] And certainly, if at the time we were going through jury selection the defense had made a cause challenge, I don't believe I would have excused him for cause. You may have chosen to exercise a peremptory. . . . That's neither here nor there. . . . But I don't believe I would have

kicked him for cause, given the fact that he has assured us that he can follow the Court's instructions, especially regarding the credibility of witnesses."

## 2. Legal Principles

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it." ' [Citations.]" (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.)

"If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged." (§ 1089.) " 'A sitting juror's actual bias, which would have supported a challenge for cause, renders him [or her] "unable to perform his [or her] duty" and thus subject to discharge and substitution.' " (*People v. Lomax* (2010) 49 Cal.4th 530, 589 (*Lomax*); see also *People v. Barton* (2020) 56 Cal.App.5th 496, 508 ["Good cause exists to discharge a juror when the juror loses his or her ability to render a fair and impartial verdict based on the evidence presented at trial"].)

The decision whether to discharge a juror is a matter within the trial court's discretion. (*Lomax*, *supra*, 49 Cal.4th at p. 589.) " ' "[W]hen a trial court's denial of a motion to discharge a juror is supported by substantial evidence, it will be upheld." ' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1211 (*Rangel*).)

## 3. Analysis

Defendant argues that Juror No. 4's "intimate and emotional relationship" with Barcinas required that he be discharged for cause. We conclude that the trial court did not abuse its discretion when it declined to discharge the juror.

After Juror No. 4 submitted a note signaling that he recognized Barcinas from his interactions with him at the Lucky supermarket where Barcinas was a cashier, the trial court conducted a thorough inquiry on two occasions of whether Juror No. 4 could be

fair and impartial. Juror No. 4 repeatedly described his relationship with Barcinas as "casual," and stated that he had never seen Barcinas outside of the store until he testified at trial. Juror No. 4 explained that he and Barcinas began talking in the checkout line when Juror No. 4 realized they had a friend in common who was diagnosed with cancer. Juror No. 4 stated that they spoke about their relationship with the mutual friend, the friend's death, and, for two to three weeks after his death, how the friend's teenage daughter was doing. By the time trial started, Juror No. 4's weekly interactions with Barcinas at the store were limited to "hi and bye," and, "[t]hanks for the groceries." Juror No. 4 selected "the shortest line when . . . shopping," not necessarily Barcinas's line. Juror No. 4 and Barcinas had not spoken about their mutual friend for about four months.

In response to the court's questioning, Juror No. 4 stated that he could be "completely fair and impartial"; he would not view Barcinas as having any more or less credibility than any other witness; he would not have any bias toward or against Barcinas or any other witness; he would weigh the facts as if he had never met Barcinas; and he would wait until deliberations to make up his mind. Juror No. 4 never wavered in his view that he could be fair.

Defendant points to Juror No. 4's statement that once he recognized Barcinas, "[his] only thought about [him] was, you know, bummer this happened to him," as evidence that Juror No. 4 had "sympathetic feeling" for Barcinas. But defendant did not contest at trial that Barcinas had been injured and robbed; defendant's defense was that the prosecution had charged "the wrong crime" because there was insufficient evidence that he uttered a statement constituting an act of extortion and that Smith and Lewis were confined for the purpose of extortion. And almost all individuals would have general feelings of sympathy for someone who was violently robbed and attacked in his or her home. Moreover, immediately after Juror No. 4 stated that it was "[a] bummer this happened to [Barcinas]," he continued, unprompted, "but I had no ill thoughts or different

15

thoughts about [defendant]. I mean, my feeling is that I just want to sit here and listen to the facts and make the best decision based on those facts. And as I mentioned to you last week, I don't feel like my casual relationship with Danny is going to affect that decision-making process at all." When the trial court followed up by specifically asking Juror No. 4 about whether his, "Bummer, this happened to him," comment meant that he had made up his mind about defendant's guilt, whether defendant was the one who perpetrated the offense, and whether it happened as alleged, Juror No. 4 responded, "No, I have not, your Honor."

Defendant relies on *United States v. Allsup* (9th Cir. 1977) 566 F.2d 68 (*Allsup*), *People v. Romero* (2017) 14 Cal.App.5th 774 (*Romero*), and *People v. Tidwell* (1970) 3 Cal.3d 62 (*Tidwell*) to demonstrate that the trial court erred when it failed to discharge Juror No. 4 for cause, but we find those cases distinguishable.

In *Allsup*, the Ninth Circuit Court of Appeals held that prospective jurors who worked at a different branch of the bank the defendant robbed should have been excused for cause. (*Allsup*, *supra*, 566 F.2d at pp. 71-72.) The court found that "[t]he potential for substantial emotional involvement, adversely affecting impartiality, is evident when the prospective jurors work for the bank that has been robbed. Persons who work in banks have good reason to fear bank robbery because violence, or the threat of violence, is a frequent concomitant of the offense. . . . The employment relationship coupled with a reasonable apprehension of violence by bank robbers leads us to believe that bias of those who work for the bank robbed should be presumed." (*Ibid.*, fn. omitted.)

Here, Juror No. 4 did not have an "employment relationship" with Barcinas. (*Allsup*, *supra*, 566 F.2d at p. 71.) Nor was there a "potential for substantial emotional involvement" based on "a reasonable apprehension of violence by bank robbers." (*Id.* at pp. 71, 72.) In short, *Allsup* is inapposite.

In *Romero*, the juror had been the victim's high school teacher approximately three years before trial. (*Romero*, *supra*, 14 Cal.App.5th at p. 779.) The court asked the

juror whether her contact with the victim would affect her ability to be fair and impartial, and the juror responded, " 'Not really. She was a good student. I remember positives. But I still think I can be fair.' " (*Ibid.*) When asked if despite those " 'positives' " the contact would cause the juror to favor the victim's testimony or prejudge the case, the juror answered, " 'I don't think so.' " (*Ibid.*) The defendant requested that the juror be discharged for cause because the defense was mistaken identity and based on the juror's positive experiences as the victim's teacher, " 'there's a good possibility she might rely on her past experiences in assessing whether or not [the victim] was wrong in this particular case.' " (*Id.* at p. 780.) The trial court declined to discharge the juror, stating that it would " 'accept [the juror's] word' " regarding her ability to be fair and impartial. (*Ibid.*)

The Court of Appeal found federal constitutional error for failure to discharge the juror for cause. (*Romero*, *supra*, 14 Cal.App.5th at p. 780.) The court held that the juror should have been discharged as she "clearly knew the victim, apparently had frequent personal interaction with the victim in an academic environment (which is customary in a teacher-student relationship), and admitted a favorable impression of the victim." (*Id.* at p. 782.) "That, years later, [the] [j]uror . . . remembered this particular student and could recall both her performance and disposition speaks to the level and depth of the relationship. [The juror's] favorable impression of her former student was especially critical given that the counts involving [the student] relied on [her] credibility and ability to recall the details of the crime." (*Id.* at p. 783.) And, "[c]ritically, it does not appear that the [trial] court looked beyond [the juror's] statement that she did not 'think' her favorable teacher-student relationship with [the victim] would affect how she perceived the evidence and participated in deliberations." (*Id.* at p. 782.) Thus, the appellate court was "not confident that the trial court's conclusion [wa]s manifestly supported by evidence on which the court actually relied." (*Ibid.*)

17

This case differs from *Romero* in several respects. First, the interactions in *Romero* between a high school teacher juror and her former student would have been more intimate, in-depth, and frequent than the interactions between Juror No. 4 and Barcinas, whose conversations at the store checkout were limited to their mutual friend dying of cancer and, more recently, "hi and bye in the store." Unlike the teacher juror in *Romero*, Juror No. 4 did not state " 'positives' " about Barcinas or have an opportunity to assess whether he was a " 'good student,' " which in *Romero* was especially important given the identity defense. (*Romero*, *supra*, 14 Cal.App.5th at p. 779.) Second, the juror in *Romero* was more equivocal in her ability to be fair and impartial than Juror No. 4. The *Romero* juror stated, " 'I remember positives. But I still think I can be fair.' " (*Ibid.*) Whereas when the trial court asked Juror No. 4 if he felt he could be fair and impartial, Juror No. 4 responded, "Yes, I do." Finally, the trial court's examination of Juror No. 4 was much more thorough than the examination in *Romero*, where the court asked the juror just two questions about her ability to be fair and impartial. (*Ibid.*) The trial court here examined Juror No. 4 about his ability to be fair and impartial on two separate occasions. The trial court observed, "I don't think he wavered at all in whether he could still follow the [c]ourt's instruction and be fair in this case, and he had the weekend to think about it." Thus, we do not find *Romero* dispositive here.

Lastly, the issue in *Tidwell* was not whether a juror should have been discharged due to actual bias, but whether the trial court properly denied the defendant's motion for a change of venue in a triple homicide capital case. (*Tidwell*, *supra*, 3 Cal.3d at p. 64.) The California Supreme Court held that "[g]iven the size of Lassen County, the nature of the crimes, and the position of at least two of the victims in the community, the trial judge should have granted a change of venue when he was presented with a showing of pervasive news coverage of prosecution evidence and county-wide hostility toward the defense." (*Id.* at pp. 72-73.) Put simply, *Tidwell* is inapplicable here because it involved

18

a different issue. (See *People v. Baker* (2021) 10 Cal.5th 1044, 1109 (*Baker*) [" ' " 'cases are not authority for propositions not considered ' " ' "].)

Defendant repeatedly characterizes Juror No. 4's relationship with Barcinas as "intimate" because it was a relationship between a customer and a store clerk who spoke at times of their mutual friend who died of cancer. But it is not our role to "*reweigh* the evidence." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1053.) Rather, we assess whether substantial evidence supports the trial court's denial of a motion to discharge a juror. (See *Rangel*, *supra*, 62 Cal.4th at p. 1211.) Juror No. 4's responses to the trial court's thorough questioning provide substantial evidence to support the court's determination that he could follow the court's instructions and be fair and impartial. Nor does anything in Juror No. 4's conduct—contacting the court once he recognized Barcinas—or his statements reveal actual bias. (See *ibid.*)

For these reasons, we conclude the trial court did not abuse its discretion when it declined to discharge Juror No. 4 for cause.

**B. *Substantial Evidence to Support the Aggravated Kidnapping Convictions***

Relying primarily on *People v. Martinez* (1984) 150 Cal.App.3d 579 (*Martinez*), disapproved on another ground in *People v. Hayes* (1990) 52 Cal.3d 577, 628, fn. 10, defendant contends that his two convictions of aggravated kidnapping must be reversed because there is insufficient evidence that Smith's confinement and Lewis's confinement were "not incidental to the commission of [Barcinas's] extortion" and that the confinements increased Smith's and Lewis's risk of harm. The Attorney General contends that the convictions are supported by ample evidence.

**1. Legal Principles and Standard of Review**

Aggravated kidnapping under section 209, subdivision (a) is committed when "[a] person . . . seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps, or carries away another person by any means whatsoever with intent to hold or detain, or who holds or detains, that person for ransom, reward, or to commit extortion or to exact

19

from another person any money or valuable thing." Despite constituting a kidnapping, "[f]orced movement of the victim is not a required element." (*People v. Rayford* (1994) 9 Cal.4th 1, 12, fn. 8 (*Rayford*).)

"Because the statute is phrased in the disjunctive, it describes four different types of aggravated kidnapping: (1) for ransom; (2) for reward; (3) to commit extortion; and (4) to exact from another person any money or valuable thing." (*People v. Ibrahim* (1993) 19 Cal.App.4th 1692, 1696 (*Ibrahim*).) As relevant here, extortion is "the obtaining of property or other consideration from another, with his or her consent, . . . induced by a wrongful use of force or fear." (§ 518, subd. (a).)

In determining a sufficiency of the evidence claim, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

### 2. *Martinez*

The Court of Appeal in *Martinez* held that in cases where a multivictim robbery "is necessarily present and forms the basis" of an aggravated kidnapping for ransom or extortion charge, the movement, seizure, or confinement of the purported kidnap victim must be more than that "merely incidental to the commission of the robbery" and must "increase the risk of harm over and above that necessarily present in the crime of the robbery itself." (*Martinez, supra*, 150 Cal.App.3d at pp. 595-596.) The court based its decision on *People v. Daniels* (1969) 71 Cal.2d 1119 (*Daniels*), superseded by statute as

stated in *People v. Robertson* (2012) 208 Cal.App.4th 965, 980 (*Robertson*), which held that the offense of aggravated kidnapping to commit robbery did not include situations where "the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (*Daniels*, *supra*, at p. 1139.) The *Daniels* court overturned the defendants' aggravated kidnapping to commit robbery convictions because the defendants essentially did "no more than move [the] victim[s] around inside the premises" in which they found them. (*Id.* at p. 1140.)

The *Martinez* court extended *Daniels* to the offense of aggravated kidnapping for ransom or extortion because "according to *Daniels* and its progeny, the aggravated kidnaping statute . . . was not intended to apply to the 'normal' robbery situation." (*Martinez*, *supra*, 150 Cal.App.3d at pp. 590-591.) Rather, "some conduct different or more dangerous than that incident to standard robberies must be shown in order to make up a kidnaping." (*Id.* at p. 593.) The court determined that this "rationale applies to situations where the victim of a robbery is placed in fear for his [or her] restrained companion" and that "[t]his application should not be defeated by the arbitrary device of charging such conduct as a kidnaping for ransom [or extortion] unless we are to revert to the discredited practice of allowing the difference between robbery and aggravated kidnaping to hinge solely on what crime the prosecutor happens to charge." (*Ibid.*)

The facts in *Martinez* were as follows. The defendant and his codefendant forced their way inside a home when the husband answered the door. (*Martinez*, *supra*, 150 Cal.App.3d at p. 586.) The defendant held a screwdriver to the husband's neck while the codefendant went into the bedroom and told the wife that "if she screamed her husband would be hit or shot by [the defendant]." (*Ibid.*) The codefendant took various items from the bedroom and raped the wife multiple times. (*Ibid.*) In the meantime, the defendant had tied up the husband in the living room. (*Ibid.*) At some point, the husband was able to escape and summon the police. (*Ibid.*) The prosecution's theory was that

"by restraining [the husband] and threatening [the wife] that he would be harmed if she screamed or interfered in the robbery, the defendants confined [the husband] to exact [the wife's] cooperation in the robbery (a 'valuable thing') within the meaning of section 209, subdivision (a). The prosecutor acknowledged that this theory of aggravated kidnapping would encompass all robberies in which the robber holds a gun on two persons and says to one of them that he will harm the other if his demand for money is refused." (*Id.* at p. 587.)

The court concluded that the husband's restraint was incidental to and not more dangerous than that inherent in the underlying robbery. (*Martinez*, *supra*, 150 Cal.App.3d at p. 597.) "In order to take the [couple's] property . . . , the defendants had to deal with both [the husband and the wife] in some way. The movements of both of them had to be controlled and the resistance of both of them quelled, and whether this was accomplished by restraining them in one room or by marching them through the house makes no legally cognizable difference." (*Ibid.*)

### 3. Analysis

We question the court's determination in *Martinez* that aggravated kidnapping for extortion requires that the victim's seizure or confinement be more than that "merely incidental to the commission of the robbery" and must "increase the risk of harm over and above that necessarily present in the crime of the robbery itself." (*Martinez*, *supra*, 150 Cal.App.3d at p. 595.)

The California Supreme Court in *Daniels* "recognize[d] that some brief movements are necessarily incidental to the crime of armed robbery" and found it " 'difficult to conceive a situation in which the victim of a robbery does not make some movement under the duress occasioned by force or fear.' " (*Daniels*, *supra*, 71 Cal.2d at p. 1134.) Thus, " 'to restrict the scope of kidnapping, as an alternative or cumulative treatment of behavior whose chief significance is robbery' " (*id.* at p. 1138), the court held that a robbery with merely incidental movement of and no substantially increased

22

risk of harm to the victim did not constitute an aggravated kidnapping (*id.* at pp. 1139-1140). Notably, the Legislature later amended the aggravated kidnapping to commit robbery statute to "adopt[] and codif[y] the *Daniels* rule." (*People v. Nguyen* (2000) 22 Cal.4th 872, 878; see § 209, subd. (b)(2) [explicitly requiring that "the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying [enumerated] offense"].)

Significantly, the Legislature has not amended the aggravated kidnapping for extortion statute to include *Daniels*'s (or, by extension, *Martinez*'s) more than merely incidental and increased risk of harm requirements. (See § 209, subd. (a); *In re Greg F.* (2012) 55 Cal.4th 393, 407 [" ' "The failure of the Legislature to change the law in a particular respect when the subject is generally before it and changes in other respects are made is indicative of an intent to leave the law as it stands in the aspects not amended." [Citations.]' "].) And unlike the underlying offense of robbery where it is " 'difficult to conceive a situation in which the victim . . . does not make some movement under the duress occasioned by force or fear' " (*Daniels*, *supra*, 71 Cal.2d at p. 1134), it is easy to conceive a situation where a victim is extorted without any detention or movement. Moreover, "[i]f the ransom [or extortion] demand is made on a person other than the kidnap victim, there is no robbery. The [aggravated] kidnapping for ransom [or extortion] statute applies '. . . to those situations involving a primary and secondary victim, where one of the victims is held or taken away and the other is subjected to a ransom or extortion demand.' " (*People v. Chacon* (1995) 37 Cal.App.4th 52, 63 (*Chacon*), quoting *Martinez.*)

But even assuming that *Martinez* was correctly decided, we conclude based on "the 'scope and nature' " of Smith's and Lewis's confinements that there is sufficient evidence to uphold the convictions as their confinements were not merely incidental to the underlying offenses and increased their risk of harm. (*People v. Vines* (2011) 51

23

Cal.4th 830, 870 (*Vines*) [considering "the 'scope and nature' " of the movement in determining whether it was incidental to the underlying robbery], overruled on a different ground by *People v. Hardy* (2018) 5 Cal.5th 56, 104.)

### a. Smith's aggravated kidnapping

There is substantial evidence that Smith's seizure or confinement was not merely incidental to the underlying offenses and that it increased his risk of harm. This was not a situation where "the robber [held] a gun on two persons and sa[id] to one of them that he will harm the other if his demand for money is refused." (*Martinez*, *supra*, 150 Cal.App.3d at p. 587.)

Rather, after finding Smith home alone and ordering him into the garage at gunpoint, defendant and Zumbado put Smith on the floor, tied his hands, took him inside the residence, brought him to his bedroom, again put him on the floor, and told him to stay there. The men knew Barcinas was at work and stated that they were waiting for him.[6] After Barcinas later entered the residence with Lewis, and defendant and Zumbado subdued them, defendant ordered Barcinas by gunpoint to the safe in the garage, where he threatened, " 'No fun and games or I'm going to shoot your roommate,' [¶] . . . [¶] 'Or your friends.' "[7] This evidence demonstrates that the incident " 'involve[ed] a primary and secondary victim, where one of the victims is held . . . and the other is subjected to a ransom or extortion demand.' " (*Chacon*, *supra*, 37 Cal.App.4th at p. 63.)

Importantly, defendant did not need to seize Smith and confine him in the bedroom, wait for Barcinas to return home, and effectively threaten Barcinas with Smith's life in order to rob Smith and burglarize the residence. Unlike in *Martinez*,

---

[6] The record does not specify how much time transpired between Smith's seizure and Barcinas's arrival home. Defendant was captured on video surveillance footage leaving the Save Mart at 7:43 p.m. Police responded to Smith's and Barcinas's residence at 9:00 p.m.

[7] Defendant also threatened, " 'Open the safe for the first time or you're going to get it.' "

24

where both the husband and wife were present when the defendants forced entry such that they both had to be "deal[t] with" to perpetrate the robbery, Smith was home alone. (*Martinez*, *supra*, 150 Cal.App.3d at p. 597.) This was not "a residential robbery in which the robbers found multiple persons at home." (*Id.* at p. 591.) Here, defendant and Zumbado found Smith at home when they knew Barcinas was at work, seized and confined Smith, told Smith they were waiting for Barcinas's arrival, and used Smith's confinement to gain Barcinas's cooperation to open the safe. This evidence supports a determination that defendant "seize[d or] confine[d] . . . [Smith] by any means whatsoever with intent to hold or detain . . . [him] to commit extortion or to exact from another person any money or valuable thing." (§ 209, subd. (a).) And "the quality of [Smith's] confinement" distinguishes this case from a routine residential robbery, given its level of violence and length. (*Martinez*, *supra*, at p. 594, italics omitted; see also *People v. Macinnes* (1973) 30 Cal.App.3d 838, 844 [aggravated kidnapping conviction proper where extortion target knew that his wife and friend "would be hurt 'if there was any trouble,' and [the wife and friend] were victims of having been '[seized] . . . to exact [money]' "].)

In addition, a reasonable fact finder could determine that Smith's seizure and confinement "increase[d] the risk of harm over and above that necessarily present in the crime of the robbery itself."[8] (*Martinez*, *supra*, 150 Cal.App.3d at p. 595.) The " ' "manner of the detention [or] movement" ' " is "critical" to the analysis. (*People v. John* (1983) 149 Cal.App.3d 798, 806 (*John*); see also *Vines*, *supra*, 51 Cal.4th at p. 870 [considering "the 'scope and nature' of the movement"].) In determining whether movement increased the risk of harm, courts have considered " ' "the decreased

---

[8] We omit "substantially" (*Martinez*, *supra*, 150 Cal.App.3d at p. 595) from *Martinez*'s requirement that the seizure or confinement increase the risk of harm beyond that inherent in a robbery as section 209, subdivision (b)(2) was amended in 1997 to require solely an increased risk of harm, not a substantially increased risk of harm. (See *Robertson*, *supra*, 208 Cal.App.4th at pp. 979-980; Stats. 1997, ch. 817, § 17.)

likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased." ' " (*Vines*, *supra*, at p. 870.)

In *John*, for example, "while [the victim] was initially confronted with an armed assailant, his subsequent treatment was not violent, he was not injured, and he was moved only on foot from place to place on the grounds and within his home while the crime was continued." (*John*, *supra*, 149 Cal.App.3d at p. 806.) Thus, the court found no substantially increased risk of harm. (*Id.* at pp. 806-807.) Whereas in *People v. Simmons* (2015) 233 Cal.App.4th 1458, 1472 (*Simmons*), "[the] movement decreased the likelihood the defendants would be detected," "allowed the defendants to engage in additional and more dangerous crimes," and "increased the possibility of something going awry and somebody getting hurt." (See *ibid.* [further observing that the movement did not only increase the risk of harm, it caused additional harm in fact].)

Here, unlike in *John*, Smith's "treatment was . . . violent" after the men approached him and ordered him into the garage at gunpoint. (*John*, *supra*, 149 Cal.App.3d at p. 806.) Smith was put on the floor of the garage, his hands were tied, he was brought to his bedroom, again put on the floor (seemingly face down), and ordered to stay there. Upon Barcinas's and Lewis's arrival at the residence, defendant and Zumbado were able to violently confront them with Smith tied up in the bedroom. Defendant "smacked [Lewis] in the face with [the] barrel of his firearm," busting his lip open, and subsequently "rushed [Barcinas] from the side and forced [him] into the bathroom." When Smith untied himself and tried to hit defendant with a bat, defendant knocked Smith unconscious, fracturing his skull. Also in the course of the violence, Barcinas sustained a head injury requiring staples. Based on this evidence, a reasonable fact finder could conclude that Smith's seizure and confinement "allowed . . . defendant[] to engage in additional and more dangerous crimes," and "increased the possibility of

something going awry and somebody getting hurt," which, in fact, occurred. (*Simmons, supra*, 233 Cal.App.4th at p. 1472.)

For these reasons, we conclude there is substantial evidence that Smith's seizure or confinement was not incidental to the underlying robbery or extortion and that his seizure or confinement increased the risk of harm beyond that inherent in the underlying crimes.

### b. Lewis's Aggravated Kidnapping

We likewise conclude that there is substantial evidence that Lewis's confinement was not merely incidental to the underlying robbery or extortion and that it increased his risk of harm. (See *Martinez, supra*, 150 Cal.App.3d at pp. 595-596.)

When Lewis walked into the residence's hallway, defendant smacked him in the face with the barrel of a gun, busting his lip open. Defendant backed Lewis into the living room at gunpoint; told Lewis he would be shot if he did not cooperate; tied Lewis's hands behind his back; had him lie on the floor face down; and tied his ankles. Lewis was "hogtied on the living room floor." Defendant then violently subdued Barcinas; violently subdued Smith, again; ordered Barcinas to the garage safe at gunpoint; and threatened Barcinas, " 'No fun and games or I'm going to shoot your roommate,' [¶] . . . [¶] 'Or your friends.' "

Like Smith's seizure and confinement, "the quality of [Lewis's] confinement" distinguishes this case from a routine residential robbery. (*Martinez, supra*, 150 Cal.App.3d at p. 594, italics omitted; see also *Rayford, supra*, 9 Cal.4th at p. 12 [considering "the 'scope and nature' of the movement" and "the context of the environment in which the movement occurred" in an aggravated kidnapping to commit rape].) The circumstances here are appreciably different from a situation where a robber solely points a gun at someone and orders another's cooperation, in part because of the heightened violence. (See *Martinez, supra*, at p. 587; see also *Rayford, supra*, at p. 12 [stating that whether the movement was incidental and whether it increased the risk of

27

harm are interrelated].)  There is substantial evidence that Lewis "was subjected to . . . greater confinement . . . than is incident to a 'normal' multivictim robbery" (*Martinez*, *supra*, at p. 591) and that defendant "seize[d or] confine[d] . . . [Lewis] by any means whatsoever with intent to hold or detain . . . [him] to commit extortion or to exact from another person any money or valuable thing" (§ 209, subd. (a)).

In addition, there is substantial evidence that Lewis's confinement increased his risk of harm.  Lewis's "treatment" continued to be violent after defendant hit him in the face with a gun and threatened to shoot him if he did not cooperate.  (*John*, *supra*, 149 Cal.App.3d at p. 806.)  Defendant proceeded to "hogtie[]" Lewis face down on the living room floor.  His confinement also allowed defendant to turn his attention to Smith and Barcinas, on whom defendant inflicted great bodily injury.  Based on this evidence, a reasonable fact finder could conclude that Lewis's confinement "allowed . . . defendant[] to engage in additional and more dangerous crimes," and "increased the possibility of something going awry and somebody getting hurt." (*Simmons*, *supra*, 233 Cal.App.4th at p. 1472.)

Thus, we determine that Lewis's "restraint . . . enlarge[d] the scope of what would otherwise be a robbery or extortion, and expose[d] him to a greater risk than would be the case if [Barcinas] were simply robbed." (*Martinez*, *supra*, 150 Cal.App.3d at p. 597.)

For all of these reasons, we conclude there is sufficient evidence to uphold the aggravated kidnapping to commit extortion convictions.

**C.** *Aggravated Kidnapping Jury Instructions*

Defendant raises several claims of error regarding the aggravated kidnapping instructions.  Defendant contends that the trial court failed to sua sponte instruct that the victim's confinement must have been greater than merely incidental to the underlying extortion and must have increased the risk of harm beyond that inherently present in the extortion; the court failed to instruct that defendant must have confined the victims to get money or something valuable from another person; and the court failed to sua sponte

28

instruct that the taking of money or other valuable thing had to be consensual. The Attorney General contends that defendant's claims have been forfeited and there was no instructional error.

### 1. Trial Court Proceedings

As relevant here, the trial court instructed the jury on aggravated kidnapping with CALCRIM No. 1202 as follows:

"To prove that the defendant is guilty of [kidnapping for the purpose of extortion], the People must prove that: [¶] l. The defendant kidnapped, abducted, seized or confined another person; [¶] 2. The defendant held or detained that person; [¶] 3. The defendant did so to commit extortion or to get money or something valuable; [¶] and [¶] 4. The other person did not consent to being kidnapped, abducted, seized or confined. [¶] It is not necessary that the person be moved for any distance. [¶] Someone intends to commit *extortion* if he or she intends to: (1) obtain a person's property with the person's consent, and (2) obtain the person's consent through the use of force or fear."

Using an adapted version of CALCRIM No. 252, the court further instructed that "[t]he specific intent required for the crime of Kidnapping for Extortion is the intent to hold or detain an individual to commit extortion or to exact from another person any money or valuable thing."

Defendant agreed to the instructions.

### 2. Legal Principles and Standard of Review

A trial court has the duty to sua sponte instruct "on general principles of law that are closely and openly connected with the facts presented at trial" and that are necessary for a jury's understanding of the case. (*People v. Ervin* (2000) 22 Cal.4th 48, 90 (*Ervin*).) "As to pertinent matters falling outside the definition of a 'general principle of law governing the case,' it is [the] 'defendant's obligation to request any clarifying or amplifying instruction.' [Citation.]" (*People v. Estrada* (1995) 11 Cal.4th 568, 574 (*Estrada*).)

We review claims of instructional error de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210 (*Cole*).) "In conducting this review, we first ascertain the relevant law and then 'determine the meaning of the instructions in this regard.' [Citation.] [¶] The proper test for judging the adequacy of instructions is to decide whether the trial court 'fully and fairly instructed on the applicable law . . . .' [Citation.] ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]" ' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111-1112 (*Martin*).)

### 3. Failure to Instruct that Aggravated Kidnapping Requires the Victims' Confinement to be Greater than Merely Incidental and to Increase Their Risk of Harm

Defendant contends that the trial court failed to sua sponte instruct that the victims' confinement must have been greater than merely incidental to the underlying extortion and must have increased the risk of harm beyond that inherently present in the extortion. As the Attorney General points out, however, defendant did not request that the aggravated kidnapping instructions be modified to include that language. Defendant's failure to request modification forfeited the claim as the given instructions adequately and correctly instructed "on [the] general principles of law . . . closely and openly connected with the facts" and necessary for the jury's understanding of the case. [9]

---

[9] Defendant asserts for the first time in his reply brief that this court should address the issue because the aggravated kidnapping instructions affected his substantial rights as they were "incorrect in law." For the reasons stated below, we determine that the trial court's failure to sua sponte include the not merely incidental to and increased risk of harm factors did not render the aggravated kidnapping for extortion instructions incorrect.

(*Ervin*, *supra*, 22 Cal.4th at p. 90; see *People v. Geier* (2007) 41 Cal.4th 555, 579 (*Geier*).)

" '[T]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language.' " (*Estrada*, *supra*, 11 Cal.4th at p. 574.)

As relevant here, the aggravated kidnapping statute states, "A person who seizes, confines, . . . abducts, . . . [or] kidnaps . . . another person by any means whatsoever with intent to hold or detain, or who holds or detains, that person for ransom, reward, or to commit extortion or to exact from another person any money or valuable thing, . . . is guilty of a felony." (§ 209, subd. (a).) There is no statutory requirement for the seizure or confinement to have been more than merely incidental to the underlying extortion or for it to have increased the victim's risk of harm. The court's instructions adequately informed the jury of the offense's elements and correctly stated the law, including that defendant must have "held or detained" the victims "to commit extortion or to get money or something valuable" and that defendant must have specifically intended "to hold or detain an individual to commit extortion or to exact from another person any money or valuable thing."

Defendant contends that *People v. Bell* (2009) 179 Cal.App.4th 428 (*Bell*) demonstrates that the trial court's instructions omitted an element of the offense, but *Bell* is distinguishable in important respects. First, unlike here, the defendant in *Bell* requested that the jury be instructed to consider whether his movement of the victim was incidental to his reckless flight from the police. (*Id.* at p. 434.) Second, *Bell* involved the crime of simple kidnapping, not aggravated kidnapping for extortion. (*Ibid.*) The court concluded based on the statutory language requiring asportation of the victim " 'into another country, state, or county, or into another part of the same county' " (*id.* at p. 435),

31

that the instruction on simple kidnapping did not completely instruct on the element of movement for a substantial distance and constituted an incorrect instruction on the law (*id.* at pp. 435, 439). There is no comparable language in the aggravated kidnapping for extortion statute. (See § 209, subd. (a).)

Defendant argues that *Martinez* demonstrates that the trial court was required to instruct on " 'not merely incidental' " and " 'increased risk of harm' " as elements of the offense. But *Martinez* did not examine the jury instructions or hold that "not merely incidental" to the underlying offense and an "increased risk of harm" were elements of aggravated kidnapping for extortion. Rather, the court reversed the aggravated kidnapping convictions based on the evidence presented in that case. (See *Martinez, supra*, 150 Cal.App.3d at p. 597.)

For these reasons, we conclude that the trial court was not required to sua sponte instruct the jury that the victim's seizure or confinement must have been more than merely incidental to the extortion and must have increased the victims' risk of harm.

### 4. Failure to Instruct that the Victims' Confinement Must Have Been to Exact Money or Something Valuable from Another Person

The trial court instructed the jury on two theories of aggravated kidnapping: (1) to commit extortion; and (2) to exact money or something valuable. Regarding the latter theory, defendant contends that the court erred in failing to instruct that the victims' confinement must have been to exact money or something valuable *from another person*. We conclude that taken together, the instructions " 'fully and fairly instructed on the applicable law.' " (*Martin, supra*, 78 Cal.App.4th at p. 1111.)

As we stated above, section 209, subdivision (a) "describes four different types of aggravated kidnapping: (1) for ransom; (2) for reward; (3) to commit extortion; and (4) to exact from another person any money or valuable thing." (*Ibrahim, supra*, 19 Cal.App.4th at p. 1696.) "For the first three types, the kidnap victim may be the same person as the person who is being extorted or from whom the ransom or reward is sought.

32

[Citations.] However, for the fourth type, there must be both a primary victim (the kidnap victim) and a secondary victim from whom the defendant seeks to exact money or something valuable." (*People v. Stringer* (2019) 41 Cal.App.5th 974, 981-982 (*Stringer*).) Indeed, "[t]he statutory language for the fourth type of aggravated kidnapping is 'to exact *from another person* any money or valuable thing' (§ 209(a), italics added), which means there must be a primary kidnap victim and a secondary victim ('another person')." (*People v. Harper* (2020) 44 Cal.App.5th 172, 192.)

While element three of the trial court's aggravated kidnapping instructions did not specify that the defendant must have held or detained someone to exact money or something valuable from another person, the instruction on the offense's specific intent did, stating, "The specific intent required for the crime of Kidnapping for Extortion is the intent to hold or detain an individual to commit extortion *or to exact from another person any money or valuable thing*." (Italics added.) The specific intent instruction was reinforced by the court's instruction on the uncharged act evidence, which stated, "If you decide that the defendant committed the uncharged offense, you may, but are not required to, consider that evidence for the limited purpose of deciding whether: [¶] . . . The defendant acted with the intent to hold or detain an individual to commit extortion or to exact from another person any money or valuable thing."

" ' " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " ' " (*People v. Young* (2005) 34 Cal.4th 1149, 1202.) Given that the instruction on the offense's specific intent included that defendant must have intended to exact money or something valuable "from another person," we determine that the court " 'fully and fairly instructed on the applicable law' " (*Martin*, *supra*, 78 Cal.App.4th at p. 1111). " ' " ' "[W]e must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " ' " (*People v. Landry* (2016) 2 Cal.5th 52, 95.)

33

### 5. Failure to Sua Sponte Instruct that Aggravated Kidnapping to Exact Money or Something Valuable Required a Consensual Taking

Defendant contends that the trial court failed to sua sponte instruct the jury that aggravated kidnapping to exact money or something valuable required that the taking be consensual. As with defendant's first claim of instructional error, we determine that the claim has been forfeited.

Defendant did not request that the instructions be modified to include that the theory of aggravating kidnapping to exact money or something valuable required a taking to be consensual. And section 209, subdivision (a) includes no such language. Again, the aggravated kidnapping statute at issue here states, "A person who seizes, confines, . . . abducts, [or] kidnaps . . . another person by any means whatsoever with intent to hold or detain, or who holds or detains, that person for ransom, reward, or to commit extortion or to exact from another person any money or valuable thing, . . . is guilty of a felony." (§ 209, subd. (a).)

There is no statutory requirement that the victim be held or detained to *consensually* exact money or something valuable, and the court's instructions adequately informed the jury of the offense's elements and correctly stated the law, including that defendant must have "held or detained" the victims "to get money or something valuable" and that defendant must have specifically intended "to hold or detain an individual to commit extortion or to exact from another person any money or valuable thing." Thus, defendant's failure to request modification forfeited the claim as the given instructions adequately and correctly instructed "on [the] general principles of law . . . closely and openly connected with the facts" and necessary for the jury's understanding of the case. (*Ervin*, *supra*, 22 Cal.4th at p. 90; see *Geier*, *supra*, 41 Cal.4th at p. 579.)

While defendant relies on *Stringer*, that case involves a different issue. There, the defendant argued that the jury instruction "omitted necessary language indicating the kidnapping must be perpetrated to exact money or property *from another person*," and

34

that under the erroneous instruction, the jury could have improperly convicted him "if he sought to exact money or property *from the kidnap victims*." (*Stringer*, *supra*, 41 Cal.App.5th at pp. 982-983.) The case is inapposite here, as the court in *Stringer* did not consider whether an aggravated kidnapping to exact money or something valuable required a taking to be consensual. " ' " '[C]ases are not authority for propositions not considered.' " ' " (*Baker*, *supra*, 10 Cal.5th at p. 1109.)

In sum, we reject defendant's claims of instructional error regarding the aggravated kidnapping instructions.

**D.** *Failure to Give Requested Pinpoint Instruction on Robbery*

Defendant contends that the trial court erred when it refused his request for a pinpoint instruction on robbery to support his defense theory. Defendant asserts that the error violated his federal due process, compulsory process, and confrontation clause rights. The Attorney General contends that the pinpoint robbery instruction was unwarranted because robbery is not a lesser included offense of aggravated kidnapping, defendant was not entitled to an instruction on a lesser related offense absent the prosecution's agreement, and the denial of the pinpoint instruction did not infringe on defendant's right to present a defense.

**1. Trial Court Proceedings**

By written motion and during a conference on jury instructions, defendant requested the court to give "a 'Special Instruction' " on robbery because he intended to argue to the jury that he had committed a robbery, which was not charged, but was not guilty of aggravated kidnapping.

Defendant's proposed instruction stated: "Even though, you, the Jury, are not being asked to consider whether [defendant] committed a Robbery, the Court is providing you with the elements of the crime. [¶] You may, but are not required to, use this information to aid in your deliberations in determining whether or not [defendant] is 'guilty' or 'not guilty' of any of the charged offenses. [¶] You must not speculate as to

35

why [defendant] is not being charged with Robbery. [¶] To commit a violation of Penal Code Section 212.5 [Residential Robbery]: [¶] 1. The Defendant took property that was not his own from inside of an inhabited dwelling; [¶] 2. The property was in the possession of another person; [¶] 3. The property was taken from the other person or his immediate presence; [¶] 4. The property was taken against the person's will; [¶] 5. The Defendant used force or fear to take the property or to prevent the person from resisting; [¶] AND [¶] 6. When the defendant used force or fear, he intended to deprive the owner of the property permanently."

Defendant asserted that he needed the instruction "[t]o effectively make the argument" that he committed robbery instead of aggravated kidnapping, but conceded that robbery is not a lesser included offense of aggravated kidnapping. Defendant stated that while he had extensively researched the issue, he "never found a case . . . where there was some type of special advisory instruction to this effect." The prosecution opposed the request.

The trial court denied defendant's requested pinpoint instruction because defendant was not charged with robbery, robbery is not a lesser included offense of aggravated kidnapping, and the prosecution had not agreed to a robbery instruction as a lesser related offense. The court also found that instructing the jury on the elements of robbery would be confusing. However, the court stated that it would permit defendant to argue this theory to the jury.

Defendant argued to the jury that the prosecution had not proven that he had committed aggravated kidnapping, and that what he "did on that day was go into the house [with] the intent to rob." Defendant asserted that it was his "position that the crime that [he] actually committed is not the one that he's being accused of," and that the jury must find him not guilty because the prosecution "charged the wrong crime."

36

## 2. Legal Principles and Standard of Review

"[A] criminal defendant is entitled to pinpoint instructions that relate particular facts to an element of the charged offense and highlight or explain a theory of the defense if the instructions are supported by substantial evidence." (*People v. Nelson* (2016) 1 Cal.5th 513, 542.)  However, "a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation]." (*People v. Moon* (2005) 37 Cal.4th 1, 30.)

We review for an abuse of discretion a trial court's refusal to give a pinpoint instruction on the basis that it was argumentative, duplicative, or potentially confusing. (See *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 497.)  "An abuse of discretion will be 'established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390 (*Bryant*).)[10]

## 3. Analysis

We conclude that the trial court did not abuse its discretion when it refused to give defendant's requested pinpoint instruction on robbery.  The trial court's determination that it would be confusing to instruct the jury on a crime that was neither charged nor a lesser included offense was not " ' "arbitrary, capricious, or patently absurd." ' " (*Bryant*, *supra*, 60 Cal.4th at p. 390.)

Defendant argues that the proposed pinpoint instruction "correctly laid out the elements of robbery" and was "no more 'confusing' than any other jury instruction on

---

[10] Citing *People v. Manriquez* (2005) 37 Cal.4th 547 (*Manriquez*), defendant asserts that the standard of review is de novo.  However, *Manriquez* pertained to a different issue, namely, whether the evidence was sufficient to require an instruction on imperfect self-defense. (*Id.* at pp. 581-582.)

the elements of an offense." Defendant's argument overlooks that all of the given jury instructions containing offense elements pertained to charged offenses or lesser included offenses. It is the fact that robbery was uncharged and not a lesser included offense that provides support for the trial court's conclusion that the instruction would have been confusing.

In a similar case, the Court of Appeal upheld a trial court's refusal to instruct on an uncharged offense. (See *People v. Valentine* (2006) 143 Cal.App.4th 1383, 1385 (*Valentine*).) There, the defendant requested an instruction on receiving stolen property "hop[ing] to convince the jury that he committed the uncharged offense and that he [should] be acquitted of the charged offense [of robbery]." (*Ibid.*) The defendant argued on appeal that although receiving stolen property was not a lesser included offense, he was "entitled to the requested instruction because the omission amounted to a failure to instruct on a defense theory." (*Id.* at p. 1387.) The Court of Appeal concluded otherwise, reasoning that allowing such an instruction would undermine the rule forbidding instruction on a lesser related offense absent the prosecution's agreement. (*Ibid.*)

Defendant argues that *Valentine* is unpersuasive because it relied on *People v. Birks* (1998) 19 Cal.4th 108, 113, 136 (*Birks*), which held solely that a defendant is not unilaterally entitled to instruction on a lesser related offense as an alternate theory of liability. Defendant correctly points out that the California Supreme Court in *Birks* did not address whether a defendant is entitled to instruction on an uncharged offense to support the defense theory that he or she is not guilty of the charged offense—that is, to argue for acquittal.

As the appellate court in *Valentine* observed, however, "the offense of receiving stolen property is not a *defense* to robbery; rather, it is a theory of criminal liability based on a different offense. Thus, the failure to give the instruction did not impinge on [the defendant's] right to present a defense to robbery." (*Valentine*, *supra*, 143 Cal.App.4th

38

at p. 1388.) Put differently, the commission of a lesser related offense does not negate any element of the charged offense, as would a true defense.

Lastly, the trial court's refusal to give defendant's pinpoint instruction on robbery did not preclude defendant from presenting his defense. As recounted above, defendant was permitted to argue that he committed robbery, not aggravated kidnapping, and made that argument at length to the jury. We therefore reject defendant's federal constitutional claims. (See *Crane v. Kentucky* (1986) 476 U.S. 683, 690 ["Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, *Chambers v. Mississippi* [(1973) 410 U.S. 284], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, [citations], the [federal] Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense' "].)

For these reasons, we conclude that the trial court did not err when it denied defendant's requested pinpoint instruction on robbery.

## E. *Cumulative Prejudice*

Defendant contends that the cumulative prejudice from the trial court's instructional errors mandates reversal of the aggravated kidnapping convictions. (See *People v. Hill* (1998) 17 Cal.4th 800, 844 ["a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error"].) However, we have rejected defendant's claims of instructional error. Because there was no instructional error, there can be no cumulative prejudice.

## F. *Uncharged Act Evidence*

Defendant contends that the trial court abused its discretion when it admitted pursuant to Evidence Code section 1101, subdivision (b) (Evidence Code section 1101(b)) evidence of his commission of a home invasion robbery in Huntington Beach in 2007, "given the striking lack of similarity" between the uncharged act and the charged incident. Defendant further contends that the admission of the evidence violated his federal constitutional right to due process. The Attorney General counters that the

trial court did not abuse its discretion in admitting the evidence "given its striking similarities to the instant crimes."

### 1. Trial Court Proceedings

The prosecution moved in limine to present evidence of defendant's 2007 home invasion robbery. The prosecution asserted that the evidence was admissible under Evidence Code section 1101(b) to prove motive, intent, and common scheme or plan and that the probative value of the evidence was not substantially outweighed by the potential of undue prejudice.

Defendant opposed the motion. Defendant asserted that the uncharged act evidence was not admissible as evidence of intent because intent was not presently at issue and that the uncharged act evidence was not sufficiently similar to the charged offense to be admissible as evidence of common scheme or plan or identity. Defendant observed that unlike in the current incident, masks, zip ties, security badges, duct tape, and two-way radios were utilized in the 2007 incident; the coperpetrators in both incidents were different; the incidents occurred in different counties; and the 2007 incident included a theft of property from the person.

At the hearing on the motion, the prosecution argued that the uncharged act was similar to the charged offense because in both instances, defendant had knowledge of the victims and their activities, including when they would arrive home and that they were marijuana dealers; defendant acted in concert with an armed accomplice; defendant received inside information about the victims from a third party; both victims were marijuana dealers; defendant and the accomplice forced their way into the homes at gunpoint, held the victims at gunpoint, ordered the victims to get down, bound the victims, took the victims from room to room at gunpoint, pistol whipped a victim, and asked where the safes were located; and defendant and the accomplice stole cash, jewelry and personal property.

Defendant referenced the differences between the incidents mentioned in his written opposition and disputed some of the alleged similarities noted by the prosecutor, including that a victim in this case was pistol whipped. Defendant argued that the 2007 incident was sophisticated whereas the current incident was not, and asserted that the incidents were "sufficiently different" to exclude the uncharged act evidence.

The trial court found that intent was at issue as the prosecution had to prove the specific intent of kidnapping for the purpose of extorting money and that the uncharged act was sufficiently similar to the charged offense to be admissible as evidence of intent and common scheme or plan. The court agreed with the prosecution's recitation of the similarities between the incidents, including that in both offenses a victim was hit in the head with a gun. The court found the "biggest similarity" was that in both situations, the victims were targeted for dealing marijuana. The court stated that the similarities showed "a common plan and not just spontaneous actions."

The court further determined that the uncharged act evidence was not unduly prejudicial under Evidence Code section 352. The court found that the evidence would not confuse the jury given that the uncharged act occurred at a different place and time than the current incident and was not inflammatory because the uncharged act was less egregious than the current incident and defendant was convicted.

As we detailed above, at trial the prosecution presented evidence of defendant's commission of a home invasion robbery in 2007. The evidence showed that defendant robbed a couple at their residence in Huntington Beach; the couple was bound with zip ties and duct tape during the incident; and the male victim was a marijuana dealer. Defendant stated in a police interview that he got the information about the male victim from a third party. Defendant said that while the third party waited outside as a lookout, he and another man went to the victim's house, waited for him to come home, and confronted him at gunpoint when he pulled into the garage. Defendant and the coperpetrator wore masks and the coperpetrator had a gun. Defendant and the

41

coperpetrator approached the man asking to buy drugs. Defendant was convicted of first degree robbery in concert in 2017.

The court instructed the jury that if it decided that defendant committed the uncharged offense, it could consider that evidence for the limited purpose of deciding whether "defendant acted with the intent to hold or detain an individual to commit extortion or to exact from another person any money or valuable thing" or whether "defendant had a plan or scheme to commit the [aggravated kidnapping] offenses charged in Counts 1 and 2."

## 2. Legal Principles and Standard of Review

" 'Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of [Evidence Code] section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition.' [Citation.] 'Evidence that a defendant committed crimes other than those for which he [or she] is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity. [Citations.]' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 667 (*Fuiava*).) "If an uncharged act is relevant to prove some fact other than propensity," such as the perpetrator's intent or the existence of a common plan, "the evidence is admissible, subject to a limiting instruction upon request." (*Bryant*, *supra*, 60 Cal.4th at p. 406).)

" 'Evidence of uncharged crimes is admissible to prove identity, common plan, and intent "only if the charged and uncharged crimes are sufficiently similar to support a rational inference" on these issues.' [Citation.] The degree of similarity varies depending on the purpose for which the evidence is offered. 'The least degree of

similarity . . . is required in order to prove intent.' [Citation.] For this purpose, 'the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' " ' [Citation.] A higher degree of similarity is required to prove the existence of a common plan: '[E]vidence of uncharged misconduct must demonstrate "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." ' [Citation.] Finally, although not at issue here, '[t]he greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity.' [Citation.] To establish identity, the uncharged and charged crimes ' " must be so unusual and distinctive as to be like a signature." ' [Citation.]" (*People v. Chhoun* (2021) 11 Cal.5th 1, 25-26, fn. omitted (*Chhoun*).)

"Even if evidence of the uncharged conduct is sufficiently similar to the charged crimes to be relevant for a nonpropensity purpose, the trial court must next determine whether the evidence's probative value is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352; [citation].)" (*Chhoun*, *supra*, 11 Cal.5 at p. 26.)

" ' "We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." [Citation.]' [Citation.]" (*Fuiava*, *supra*, 53 Cal.4th at pp. 667-668, fn. omitted.)

### 3. Analysis

Defendant argues that the trial court erred when it admitted the uncharged act evidence under Evidence Code section 1101(b) as evidence of intent because the uncharged crime of robbery and the charged crime of aggravated kidnapping for extortion have different intent requirements. Defendant further argues that the offenses lacked sufficient similarity to be admissible as evidence of either intent or common scheme or

43

plan. The Attorney General argues that based on the incidents' similarities, "[e]vidence of the [robbery] was admissible to show that [defendant] was acting in furtherance of a specific and consistent criminal design or plan."

We conclude that the trial court erred when it admitted evidence of the uncharged robbery as evidence of defendant's intent in the current incident, but that it was properly admitted as evidence of defendant's common scheme or plan. We further determine that the erroneous admission of the uncharged act as evidence of intent was harmless because it is not reasonably probable that defendant would have obtained a more favorable result had the uncharged act not been admitted as evidence of intent. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

Regarding the admission of the uncharged act as evidence of intent, the uncharged act must tend to show that defendant " ' " 'probably harbor[ed] the same intent in each instance.' " ' " (*Chhoun*, *supra*, 1 Cal.5th at p. 25.) In the uncharged act admitted here, defendant committed robbery, which "require[d] the 'specific intent to permanently deprive' the victim of his or her property." (*People v. Wilson* (2021) 11 Cal.5th 259, 301.) The charged offense, in contrast, required the specific intent to hold or detain an individual to commit extortion or to exact from another person any money or valuable thing. (§ 209, subd. (a); see *People v. Greenberger* (1997) 58 Cal.App.4th 298, 374; *People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1235 (*Ordonez*).) Thus, even though the uncharged offense and the charged offense shared similarities in their commission, the uncharged robbery could not demonstrate that defendant " ' " 'probably harbor[ed] the same intent' " ' " in his commission of aggravated kidnapping to commit extortion or to exact something of value. (*Chhoun*, *supra*, at p. 25.) It was therefore error for the trial court to admit the uncharged act under Evidence Code section 1101(b) as evidence of defendant's intent.

However, the similarities between the uncharged robbery and the charged aggravated kidnapping did tend to show that " 'the various acts are naturally to be

44

explained as caused by a general plan of which they are the individual manifestations.' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).) "Evidence of a common design or plan . . . is not used to prove the defendant's intent or identity but rather to prove that the defendant engaged in the conduct alleged to constitute the charged offense." (*Id.* at p. 394, fn. omitted.) " 'When a defendant's conduct in connection with the previous crime bears such similarity in significant respects to his conduct in connection with the crime charged as naturally to be explained as caused by a general plan, the similarity is not merely coincidental, but indicates that the conduct was directed by design.' " (*Id.* at p. 396.) "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*Id.* at p. 403.)

In both instances, defendant targeted a drug dealer at his home. Both offenses involved defendant and a cohort approaching the victims with a ruse. In the uncharged incident, defendant and the coperpetrator approached asking to buy drugs; in the charged incident, defendant and the coperpetrator approached asking if the truck in the driveway was for sale. Then, in each instance, defendant or his coperpetrator confronted the victims with a gun. The victims were bound and guns were used not just to intimidate but to strike one of the victims in the head in each instance. There was also evidence from which a reasonable fact finder could infer that defendant had received inside information about the drug dealer victims before the offenses and that defendant had waited at the residences for the drug dealer victims to arrive home. Moreover, the charged incident occurred only 18 months after the uncharged offense. Because of the similarities between the incidents, the uncharged act evidence tended to show that defendant's " 'conduct was directed by design.' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 396.)

Defendant asserts that "[i]nsofar as the [uncharged act] evidence had insufficient similarity to be admissible on the issue of intent, it necessarily follows that the evidence was erroneously admitted on a common plan or scheme theory." While a higher degree

45

of similarity is required to prove the existence of a common plan or scheme than to prove intent, the charged and uncharged crimes must be " ' "sufficiently similar to support a rational inference" on these [particular] issues.' " (*Chhoun*, *supra*, 11 Cal.5th at p. 25; see *People v. Sully* (1991) 53 Cal.3d 1195, 1224 [courts must identify the material fact sought to be proved or disproved and analyze the tendency of the uncharged crime to prove or disprove the material fact].) In other words, the divergence of legal intents between the two incidents did not render the uncharged act evidence inadmissible as evidence of a common plan or scheme. The uncharged act evidence was sufficiently similar to be " 'admissible to show [a] general criminal plan.' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 400, italics omitted; see *People v. Foster* (2010) 50 Cal.4th 1301, 1330 ["That the violent confrontation in the current case ended in death rather than a sexual assault does not detract significantly from the pattern reflected in the three incidents"].)

Nor did the trial court abuse its discretion in determining that the probative value of the uncharged act evidence as proof of common scheme or plan was not "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) The uncharged incident was not particularly inflammatory as it was less violent than the charged offense and resulted in a conviction. The evidence was limited to the brief testimony of a police detective, defendant's police interview, and the parties' stipulations regarding a DNA match to defendant and defendant's conviction.

Thus, we conclude that although it was error to admit the uncharged act as evidence of intent, the uncharged act was properly admitted as evidence of common plan or scheme.

## 4. Admission of the Uncharged Act as Evidence of Intent Was Harmless

Defendant contends that prejudice from the erroneous admission of the uncharged act evidence must be assessed under *Chapman v. California* (1967) 386 U.S. 18 because the evidence violated his right to due process under the federal constitution as it was "irrelevant and highly prejudicial." (See *id*. at p. 24 [a federal constitutional error is harmless if it is beyond a reasonable doubt that the error did not contribute to the verdict].) However, "the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair." (*People v. Partida* (2005) 37 Cal.4th 428, 439, italics omitted (*Partida*).) Defendant has not demonstrated that the admission of the relatively brief, not particularly inflammatory uncharged act evidence rendered his trial fundamentally unfair, especially since the uncharged act was properly admitted as evidence of common plan or scheme.

"Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test." (*Partida*, *supra*, 37 Cal.4th at p. 439.) " 'Erroneous admission of other crimes evidence is prejudicial if it appears reasonably probable that, absent the error, a result more favorable to the defendant would have been reached.' " (*People v. Winkler* (2020) 56 Cal.App.5th 1102, 1164; see *People v. Welch* (1999) 20 Cal.4th 701, 749-750 [analyzing prejudice from erroneously admitted Evid. Code § 1101(b) evidence under *Watson*].)

We conclude that it is not reasonably probable that the results of the proceeding would have been more favorable to defendant had the uncharged act evidence not been admitted as evidence of intent. As we explained above, the uncharged act evidence was properly admitted under Evidence Code section 1101(b) as evidence of common plan or scheme. Thus, even if it had been excluded as evidence of intent, it still would have been admitted as evidence of common plan or scheme, which substantially diminishes any prejudice from the error. (See *People v. Davis* (2009) 46 Cal.4th 539, 603.) Moreover,

47

defendant used the uncharged act evidence to argue that in this case he was improperly charged with, and not guilty of, aggravated kidnapping to commit extortion because he had the intent to rob, as he did during the uncharged offense. And the prosecution conceded during its rebuttal argument that the intent in the uncharged incident was different from the intent in the instant offense. Lastly, as we stated above, the uncharged act evidence was not particularly inflammatory compared to the current offense and the parties stipulated that defendant was convicted in that case.

In sum, we determine that the uncharged act was properly admitted as evidence of common plan or scheme and that although it was error to admit the uncharged act as evidence of intent, the error was harmless as it is not reasonably probable that a result more favorable for defendant would have been reached absent its admission for proof of intent. (See *Watson*, *supra*, 46 Cal.2d at p. 836.)

## G. *Statute of Limitations for Grand Theft*

Defendant contends that the grand theft convictions must be reversed because the charges were not filed within the three-year statute of limitations under section 801. The Attorney General contends that the charges were timely filed as the four-year statute of limitations under sections 801.5 applied because grand theft is an offense described in section 803, subdivision (c).

### 1. Trial Court Proceedings

On September 5, 2012, the prosecution initially charged defendant with six counts of grand theft committed on or about May 21, 2009.[11] An arrest warrant was issued on October 18, 2012, which was approximately three years and five months after the crimes' alleged commission.[12]

---

[11] As we have recited in the procedural background, defendant was ultimately charged by second amended information with only four counts of grand theft (counts 3, 4, 5, and 6).

[12] Section 804 provides that "prosecution for an offense is commenced when any (continued)

Defendant filed a motion to dismiss claiming that the prosecution was barred by the three-year statute of limitations under section 801. The prosecution opposed the motion asserting that the four-year statute of limitations under sections 801.5 and 803, subdivision (c) applied.

The trial court denied the motion, relying on *People v. Price* (2007) 155 Cal.App.4th 987 (*Price*) and finding that section 803, subdivision (c) applies to grand theft charges "without limitation," thus triggering the four-year statute of limitations under section 801.5.

On March 5, 2018, defendant was arraigned on an amended complaint charging him with two counts of aggravated kidnapping and six counts of grand theft committed on or about May 21, 2009. Defendant filed a second motion to dismiss the grand theft charges based on the statute of limitations; the prosecution opposed the motion; and the motion was denied.

### 2. Standard of Review

The determination of whether grand theft is included under section 803, subdivision (c) such that the four-year statute of limitation under section 801.5 applies requires statutory interpretation, which we perform de novo. (See *People v. Prunty* (2015) 62 Cal.4th 59, 71.) "We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] To determine legislative intent, we turn first, to the words of the statute, giving them their usual and ordinary meaning. [Citations.] When the language of a statute is clear, we need go no further. However, when the language is susceptible of more than one reasonable interpretation, we look to a variety of extrinsic aids, including the ostensible

---

of the following occurs: [¶] (a) An indictment or information is filed. [¶] (b) A complaint is filed charging a misdemeanor or infraction. [¶] (c) The defendant is arraigned on a complaint that charges the defendant with a felony. [¶] (d) An arrest warrant or bench warrant is issued . . . ."

49

objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. [Citations.]" (*People v. Flores* (2003) 30 Cal.4th 1059, 1063 (*Flores*).)

### 3. Analysis

Section 799 et seq. governs the time period to commence a criminal action. Generally, "prosecution for an offense punishable by imprisonment in the state prison or pursuant to subdivision (h) of Section 1170 shall be commenced within three years after commission of the offense." (§ 801.)

However, section 801.5 provides, "Notwithstanding Section 801 or any other provision of law, prosecution for any offense described in subdivision (c) of Section 803 shall be commenced within four years after discovery of the commission of the offense, or within four years after the completion of the offense, whichever is later." Section 803, subdivision (c)(1) "applies to an offense punishable by imprisonment in the state prison or imprisonment pursuant to subdivision (h) of Section 1170, a material element of which is fraud or breach of a fiduciary obligation, the commission of the crimes of theft or embezzlement upon an elder or dependent adult, or the basis of which is misconduct in office by a public officer, employee, or appointee, including, but not limited to, the following offenses: [¶] (1) Grand theft of any type, forgery, falsification of public records, or acceptance of, or asking, receiving, or agreeing to receive, a bribe, by a public official or a public employee. . . ."[13]

In *Price*, the Court of Appeal determined that grand theft is an offense described in section 803, subdivision (c) and is therefore subject to the four-year statute of limitations under section 801.5. (*Price*, *supra*, 155 Cal.App.4th at p. 996.) The court

---

[13] Section 801.5 remains unchanged since 1995. As quoted above, the only difference between the current version of section 803 and the version in effect at the time of the offenses in 2009 is the current language referencing imprisonment pursuant to section 1170, subdivision (h). (See Stats. 2007, ch. 579, § 41.)

found section 803, subdivision (c)(1)'s language ambiguous. (*Price*, *supra*, at pp. 992-993.) After a thorough examination of the statute's legislative history, the court concluded that "grand theft and forgery, without limitation, fall under it." (*Id.* at p. 993; cf. *People v. Moore* (2009) 176 Cal.App.4th 687, 692, fn. omitted ["section 801.5 provides that prosecution of certain offenses, including grand theft, fraud and perjury, 'shall be commenced within four years after discovery of the commission of the offenses' "]; *People v. Thorbourn* (2004) 121 Cal.App.4th 1083, 1086 ["The statute of limitations for grand theft and forgery is four years, but that period does not begin to run until the crimes are discovered. (§§ 801.5; 803, subd. (c)(1))"].)

Defendant asserts that *Price* "was wrongly decided" and that section 803, subdivision (c)(1) does not include "a generic 'grand theft.' " Defendant argues that it is "readily apparent" from the plain language of section 803, subdivision (c)(1) that only grand thefts that contained a material element of fraud or a breach of a fiduciary obligation, were perpetrated on an elder or dependent adult, or involved misconduct by a public officer, employee, or appointee fall under the statute.

While defendant's interpretation of section 803, subdivision (c)(1) is reasonable, we agree with the court's determination in *Price* that the statute "can be read several ways." (*Price*, *supra*, 155 Cal.App.4th at p. 993.) "It can be read as describing the crimes of grand theft and forgery generally and without limitation. Or it can be read as describing only certain types of grand theft and forgery." (*Ibid.*) Thus, because section 803, subdivision (c)(1) "is susceptible of more than one reasonable interpretation," it is appropriate to consider its legislative history. (*Flores*, *supra*, 30 Cal.4th at p. 1063.)

*Price* detailed that "[b]efore section 803(c) was enacted in 1984, a three-year limitations period applied to most felonies. (Former § 800, subd. (a), repealed by Stats. 1984, ch. 1270, § 2, p. 4335.) But certain felonies, including grand theft and forgery, were subject to a three-year limitations period commencing with the discovery

51

of the crime. (Former § 800, subd. (c), repealed by Stats. 1984, ch. 1270, § 2, p. 4335.) Grand theft and forgery were therefore subject to a discovery rule before section 803(c) was enacted. [¶] There is no suggestion in section 803(c)'s legislative history that the discovery rule theretofore applicable to grand theft and forgery was eliminated by its enactment. To the contrary, section 803(c) retained the discovery rule, and, moreover, made that rule applicable to many of the same crimes in repealed section 800, subdivision (c), such as grand theft. . . . 'The substance of [former, repealed section 800] subdivision (c) is continued in new Sections 801 (three-year limitation period for felonies) and 803 (tolling of limitation period), with the exception of voluntary and involuntary manslaughter . . . .' (Recommendation relating to Statutes of Limitation for Felonies (Jan. 1984) 17 Cal. Law Revision Com. Rep. (1984) appen. 3, p. 329.)" (*Price*, *supra*, 155 Cal.App.4th at pp. 993-994, fns. & italics omitted; see *id.* at p. 995 [comment regarding 1985 amendment to § 803, subd. (c) to clarify the statute of limitations for corporate securities violations that " '[s]imilar language is presently used to make clear that all grand thefts run from the date of discovery whether or not fraud is involved' " (italics omitted)].) In addition, "[t]he Law Revision Commission Comment to section 803(c) also attributes a broad meaning to the subdivision: 'Although subdivision (c) generally governs crimes involving fraud or breach of fiduciary duty, all types of grand theft are included within subdivision (c) in order to avoid the need to characterize the material elements of the particular crime in every case.' (Cal. Law Revision Com. com., 50 West's Ann. Pen. Code (1985 ed.) foll. § 803, p. 203.)" (*Price*, *supra*, at p. 996, fn. 9.)

Based on this legislative history, we concur with the court in *Price* that section 803, subdivision (c)(1) includes "grand theft . . . without limitation." (*Price*, *supra*, 155 Cal.App.4th at p. 993; see also *People v. Fine* (1997) 52 Cal.App.4th 1258, 1266 ["When the criminal statute of limitations scheme was recodified in 1984, the new legislation included language in subdivision (c)(1) extending the tolling provision to:

'Grand theft *of any type*, forgery, falsification of public records, or acceptance of a bribe by a public official or a public employee' "].)  Accordingly, because grand theft is an offense described in section 803, subdivision (c), the four-year statute of limitations under section 801.5 applied to the grand theft charges in this case.  (See *Price*, *supra*, at p. 996; §§ 801.5, 803, subd. (c)(1).)  As an arrest warrant was issued for defendant within four years of the commission of the grand theft offenses, we conclude that the charges were timely filed.  (§ 804.)

## H. *Conviction of Multiple Grand Thefts*

Defendant was convicted of grand theft in counts 3, 4, 5, and 6.  On appeal, he contends that three of the four grand theft convictions (that is, counts 4, 5, and 6) must be reversed because the thefts occurred at the same time and place—that is, "he stole different items of property during a single incident."  The Attorney General contends that the separate grand theft convictions were proper because they involved different victims and because the grand theft firearm statute authorized separate convictions for the theft of each firearm.[14]

### 1.  Trial Court Proceedings

The second amended information charged defendant with three counts of grand theft of a firearm and one count of grand theft committed on or about May 21, 2009. Count 3 alleged that defendant unlawfully took Smith's .357 Ruger revolver in violation of section 487, subdivision (d)(2); count 4 alleged that defendant unlawfully took

---

[14] The Attorney General also contends that the claim has been forfeited by defendant's failure to raise it below as "the single larceny doctrine" arises from the federal constitutional protection against double jeopardy, a claim that must be preserved. However, the authority cited by the Attorney General for this proposition is inapposite. The federal constitutional protection against double jeopardy "affords a defendant three basic protections: ' "[It] protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction. And it protects against multiple *punishments* for the same offense." ' [Citations.]" (*Ohio v. Johnson* (1984) 467 U.S. 493, 498, italics added.)  Defendant here disputes the propriety of his multiple grand theft convictions in the same prosecution.

Barcinas's .44-caliber Magnum Research Desert Eagle semiautomatic handgun in violation of section 487, subdivision (d)(2); count 5 alleged that defendant unlawfully took Barcinas's Mossberg 500 12-guage shotgun in violation of section 487, subdivision (d)(2); and count 6 alleged that defendant unlawfully took Barcinas's money and personal property exceeding $950 in value in violation of section 487, subdivision (a). The prosecution tracked the second amended information's descriptions of the counts in its argument to the jury, identifying the offense, what was stolen, and from whom. The verdict forms for the grand theft counts specified the offense, the date, and the object stolen, but did not name the victim.

## 2. Legal Principles and Standard of Review

"In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct." (*People v. Reed* (2006) 38 Cal.4th 1224, 1226; see §§ 954, 654.) However, in *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*), the California Supreme Court applied the following test to grand theft: "Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan. [Citation.]" (*Id.* at p. 519.)

The defendant in *Bailey* was convicted of grand theft based on evidence that she had unlawfully obtained a number of welfare payments by false pretenses. (*Bailey*, *supra*, 55 Cal.2d at pp. 515, 518.) The issue before the California Supreme Court was "whether [the defendant] was guilty of grand theft or of a series of petty thefts since it appears that she obtained a number of payments, each less than $ 200 but aggregating more than that sum." (*Id.* at p. 518, fn. omitted.) The court concluded that the defendant was properly convicted of a single count of grand theft. (*Id.* at pp. 515, 520.)

54

"After *Bailey* was decided, various Court of Appeal decisions expanded *Bailey* beyond its facts." (*People v. Nilsson* (2015) 242 Cal.App.4th 1, 13.) Subsequently, in *People v. Whitmer* (2014) 59 Cal.4th 733 (*Whitmer*), the California Supreme Court clarified the rule of *Bailey*. The *Whitmer* court explained that *Bailey* involved a defendant who had made a single misrepresentation and who had received a series of welfare payments as a result. (*Whitmer*, *supra*, at p. 740.) The *Whitmer* court explained that, "[o]ther than *omitting* to correct the misrepresentation and accepting the payments, the defendant [in *Bailey*] committed no separate and distinct fraudulent acts." (*Ibid.*)

The *Whitmer* court contrasted *Bailey* with the case before it, in which the defendant committed separate and distinct fraudulent acts. (*Whitmer*, *supra*, 59 Cal.4th at p. 740.) The *Whitmer* court went on to hold that "a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme." (*Id.* at p. 741.) Although the *Whitmer* court expressed its "disapprov[al] of any interpretation of *Bailey* that is inconsistent with this conclusion," the *Whitmer* court did not apply its rule to the facts before it. (*Ibid.*) The *Whitmer* court explained that a "long, uninterrupted series of Court of Appeal cases, beginning . . . in 1978, . . . have consistently held that multiple acts of grand theft pursuant to a single scheme cannot support more than one count of grand theft." (*Id.* at p. 742.) Those Court of Appeal cases barred " 'multiple convictions for grand theft when the individual thefts arise from a recognizable plan or scheme, even though each theft is separate and distinct, and involves property or money exceeding the amount needed for grand theft.' " (*Id.* at p. 739.) The *Whitmer* court determined that due process precluded application of its subsequent contrary conclusion to the defendant in the case before it. (*Id.* at p. 742.)

The *Whitmer* court instead applied to the facts before it the earlier rule that had emanated from the Court of Appeal cases. In *Whitmer*, the defendant was the manager of a motorcycle dealership. He arranged for the fraudulent sale of 20 vehicles to

fictitious buyers on 13 different dates, which resulted in a total loss to the dealership of over $250,000. (*Whitmer*, *supra*, 59 Cal.4th at p. 735.) The defendant "committed a series of separate and distinct, although similar, fraudulent acts in preparing separate paperwork and documentation for each fraudulent transaction." (*Id.* at p. 740.) The defendant was convicted of 20 counts of grand theft, one count for each of the vehicles fraudulently sold. (*Id.* at p. 735.) The jury also found true a section 12022.6 allegation. (*Whitmer*, *supra*, at pp. 735-736.) The *Whitmer* court concluded that only one count of grand theft was permissible, explaining as follows: "In finding the [section 12022.6] enhancement allegation true that defendant took property valued at more than $200,000, the jury necessarily found that the grand thefts arose 'from a common scheme or plan.' (Pen. Code, § 12022.6, subd. (b).) The law as it had existed for decades before defendant committed his crimes permitted conviction of only one count of grand theft under those circumstances. Because defendant is entitled to the benefit of that law, he cannot be convicted of more than one count of grand theft." (*Id.* at p. 742.)

"We apply the *Bailey* rule 'as a matter of law only in the absence of any evidence from which the jury could have reasonably inferred that the defendant acted pursuant to more than one intention, one general impulse, or one plan.' " (*People v. Reid* (2016) 246 Cal.App.4th 822, 831-832 (*Reid*).)

### 3. Analysis

In this case, defendant committed the offenses before *Whitmer* clarified the *Bailey* rule. Thus, defendant is entitled to the benefit of case law barring " 'multiple convictions for grand theft when the individual thefts arise from a recognizable plan or scheme, even though each theft is separate and distinct, and involves property or money exceeding the amount needed for grand theft.' " (*Whitmer*, *supra*, 59 Cal.4th at p. 739; see *id.* at p. 742.)

Under the guidance of the California Supreme Court in *Witmer*, we conclude that there is an " 'absence of any evidence from which the jury could have reasonably inferred

that . . . defendant acted pursuant to more than one intention, one general impulse, or one plan.' " (*Reid*, *supra*, 246 Cal.App.4th at pp. 831-832.) The evidence demonstrates that defendant confined Smith, waited for Barcinas to arrive home, confined Lewis, and then used Smith's and Lewis's confinements to extort Barcinas to open a safe in the garage, from which defendant took Smith's .357 Ruger revolver, Barcinas's Desert Eagle handgun, and Barcinas's jewelry and cash. The evidence also shows that defendant committed a similar offense 18 months before the current incident pursuant to a common scheme or plan. Although defendant took another firearm in the current incident, described in the information as a "Mossberg 500 12-guage shotgun," it is unclear from the record when the shotgun was taken and to whom it belonged. Smith testified that while he was tied up in his bedroom, defendant and the coperpetrator took his shotgun from the bedroom. But Barcinas testified that a shotgun belonging to him was taken from the hallway closet, and the information alleged that Barcinas owned the Mossberg shotgun. Regardless, even if the theft of the Mossberg shotgun was " 'separate and distinct,' " all of the thefts arose " 'from a recognizable plan or scheme.' " (*Whitmer*, *supra*, 59 Cal.4th at p. 739.)

The Attorney General argues that the single larceny doctrine does not apply to thefts from multiple victims, and both *Bailey* and *Whitmer* involved a single victim. However, the California Supreme Court observed in a case involving the receipt of stolen property belonging to several different owners, "Neither the legal nor moral character of the act is affected in any way by the fact that the stolen property may have belonged to several persons rather than to a single person." (*People v. Smith* (1945) 26 Cal.2d 854, 859.) In support of its holding, the court reasoned "by analogy in the authorities dealing with the crime of larceny, which authorities hold that the theft of several articles at one and the same time constitutes but one offense although such articles belong to several different owners." (*Ibid.*) Moreover, the Courts of Appeal have disagreed about whether *Bailey* applies in a case involving multiple victims. (Compare, e.g., *People v. Tabb*

57

(2009) 170 Cal.App.4th 1142, 1149 [*Bailey* has generally been limited to thefts involving a single victim] and *In re David D.* (1997) 52 Cal.App.4th 304, 310 (*David D.*) ["one limitation of the *Bailey* doctrine is its inapplicability to offenses involving multiple victims"] with *People v. Brooks* (1985) 166 Cal.App.3d 24, 31 [applying *Bailey* to multiple thefts from a single fund to which multiple victims had contributed], disapproved on another point in *Whitmer*, *supra*, 59 Cal.4th at pp. 739-740; *People v. Columbia Research Corp.* (1980) 103 Cal.App.3d Supp. 33, 41 [concluding that multiple thefts from different victims could be accumulated to constitute a single felony offense]; and *People v. Gardner* (1979) 90 Cal.App.3d 42, 47 ["in the crime of larceny the simultaneous theft of several items of property, even from multiple owners, constitutes but a single offense"].)

The Attorney General relies on *Reid*, *supra*, 246 Cal.App.4th 822, *In re Arthur V.* (2008) 166 Cal.App.4th 61 (*Arthur V.*) and *David D.*, *supra*, 52 Cal.App.4th 304, but we find those cases distinguishable. In *Reid*, based on the facts, the court determined that the case "does *not* require articulation of an absolute rule regarding *Bailey* and a single victim versus multiple victims." (*Reid*, *supra*, at p. 834, italics added.) The court found multiple grand theft convictions proper despite that "the nine urns were stolen from the mausoleum during a single crime spree." (*Ibid.*) The Court observed that "each urn was contained in a separate niche covered by its own pane of glass. Each urn was heavy and required both hands to lift and carry it, with the double urns being sufficiently heavy to require being 'walk[ed]' along the floor. As a result, the theft required [the] defendant to break each pane of glass and remove each urn individually. Each urn then had to be moved out of the building and stashed one at a time. Additionally, the urns were purchased separately and were the property of separate victims, a fact that was apparent given the separate niches and the metal identification plaques on the urns." (*Ibid.*, fn. omitted.) In the case at hand, in contrast, the evidence

demonstrates simply that defendant took Smith's Ruger revolver from the safe along with Barcinas's Desert Eagle handgun, jewelry, and cash.

In *Arthur V.*, the court recognized that the *Bailey* rule was developed to allow the aggregation of multiple petty thefts into a grand theft. (*Arthur V.*, *supra*, 166 Cal.App.4th at pp. 65-69.) The court extended the *Bailey* rule to vandalism, holding that aggregation was appropriate in the case before it because "[t]he damage to the windshield and cell phone occurred within a very brief time period, in the same approximate location, and constituted the victimization of the same person (Wasimi) who had been singled out for abuse by Arthur and his associates. A reasonable fact finder could conclude from these facts that the aggregate damage to Wasimi's car and cell phone did not result from separate and distinct criminal acts, and was inflicted pursuant to a single general impulse, intention or plan." (*Arthur V.*, *supra*, at p. 69.) However, the court noted when discussing the "dividing line" between cases where aggregation was permissible and those where it was not, that "the existence of multiple victims will not *necessarily* preclude aggregation. For example, an offense consisting of the spray painting of one's name across property owned by multiple persons would clearly be properly aggregated into a single count, despite the presence of multiple victims. Thus, rather than creating some artificial dividing line, 'the number of victims involved is only one factor to be considered in determining whether there is one intention, one general impulse, and one plan.' " (*Id.* at p. 68 & fn. 4.)

*David D.* is another vandalism case. (*David D.*, *supra*, 52 Cal.App.4th at p. 306.) There, the court disallowed aggregation because the vandalism "did not arise out of the 'same transaction'; [it] arose out of 34 'transactions,' one occurring each time [the minor] or a co-perpetrator sprayed an item of property. [The minor] and his friends drove throughout the city, tagging property they happened upon which appeared isolated and safe from witnesses. In our view, each tagging incident clearly represents a separate offense affecting a different victim." (*Id.* at pp. 310-311.) Importantly, however, the

59

court stated, "We do not intend to imply . . . that the *Bailey* doctrine can never be appropriate to a theft or thefts from multiple victims." (*Id.* at p. 309, fn. 3.)

Rather than support the Attorney General's position that *Bailey* does not apply here because multiple victims were involved, these cases establish that the essential inquiry is whether there is evidence from which " 'the jury could have reasonably inferred that the defendant acted pursuant to more than one intention, one general impulse, or one plan.' " (*Reid, supra*, 246 Cal.App.4th at pp. 831-832.)

Lastly, the Attorney General argues that "the firearm theft statute itself expressly authorized each theft of a firearm to be charged as a separate offense." We are not persuaded.

Section 487 defines grand theft. As relevant here, the statute provides, "Grand theft is theft committed in any of the following cases: [¶] (a) When the money, labor, or real or personal property taken is of a value exceeding nine hundred fifty dollars ($950) . . . [¶] . . . [¶] (d) When the property taken is any of the following: [¶] . . . [¶] (2) A firearm." The statute does not express when multiple grand theft convictions are authorized; the statute defines what constitutes grand theft instead of petty theft. (See §§ 486, 487; cf. *Whitmer, supra*, 59 Cal.4th at p. 739 [observing that the appellate courts had interpreted *Bailey* as " 'bar[ring] multiple convictions for grand theft when the individual thefts arise from a recognizable plan or scheme, even though each theft is separate and distinct, and involves property or money exceeding the amount needed for grand theft' "].) The authority cited by the Attorney General is not to the contrary.

For these reasons, we determine that under the law at the time of the offenses and based on the record before us, defendant could only properly be convicted of one count of grand theft because there is an " 'absence of any evidence from which the jury could have reasonably inferred that the defendant acted pursuant to more than one intention, one general impulse, or one plan.' " (*Reid, supra*, 246 Cal.App.4th at pp. 831-832.)

Accordingly, we will strike the convictions on counts 4 through 6, while allowing the conviction on count 3 to stand.[15]

## I. *Cruel and Unusual Punishment*

Defendant contends that his LWOP sentence on count 1, aggravated kidnapping of Smith for extortion (§ 209, subd. (a)), is cruel and unusual punishment under the California Constitution. The Attorney General contends that the punishment does not violate the state Constitution.

### 1. Trial Court Proceedings

In a sentencing memorandum, defendant contended that an LWOP sentence for aggravated kidnapping of Smith for extortion with bodily injury (§ 209, subd. (a)) was cruel and unusual punishment. Among other arguments, defendant contended that he was not "beyond redemption" and could "reintegrate into [a] law abiding society" although he acknowledged that the present case and the prior Orange County case were "committed with some degree of forethought and planning," were "violent in nature," and were motivated by "[t]he lure of easy money."

At sentencing, the trial court indicated that it had considered the relevant factors set forth by the California Supreme Court in determining whether the punishment was cruel and unusual. The court ruled: "I cannot state that after considering those factors that the punishment is grossly disproportionate to the defendant's individual culpability. And I can't get over the fact that the [L]egislature has [seen] fit to set forth the punishment of life without parole for this crime. As I stated before, I find it somewhat inconsistent with the punishment proscribed for kidnapping for robbery, which allows the defendant a chance at parole. . . . I don't see any reason for the difference in punishment here, but the [L]egislature clearly did. [¶] . . . [¶] . . . I mean, it's the proscribed

---

[15] Because we conclude that count 6 must be reversed, we do not reach defendant's claim that the punishment on count 6 must be stayed.

statutory punishment. I don't think there's any way for me to get around that as long as I'm punishing [defendant] for the crime he's been convicted for. That's the sentence.

"Again, I find it strange. Even though there's a secondary victim and a primary victim, I do think that [defendant], in looking at his individual circumstances, although the People have pointed out many aggravating factors, but given how many years he was law-abiding and was working at a family, appeared to be a productive member of society, I do not here understand the no chance at parole given all those circumstances. But I do find he committed the crime and should be punished for it, and that's the appropriate punishment.

"You know, while the case, I assume it will be appealed, and perhaps the difference in the sentences will be taken care of. And certainly our [L]egislature, as all the attorneys here know, seem very amenable to changing the statutory scheme of punishment and penalties for certain crimes, especially if they think that one is too severe given the circumstances and the elements of the crime. So I will say that. But I must follow the law." The court ultimately imposed LWOP on count 1 for aggravated kidnapping for extortion with bodily injury (§ 209, subd. (a)).

### 2. Legal Principles and Standard of Review

The California Constitution prohibits "[c]ruel or unusual punishment." (Cal. Const., art. I, § 17.) "Punishment is cruel and unusual if it is so disproportionate to the crime committed that it shocks the conscience and offends fundamental notions of human dignity. [Citation.]" (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358 (*Mantanez*).)

In analyzing disproportionality, we give "great deference" to the Legislature. (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494; accord, *In re Palmer* (2021) 10 Cal.5th 959, 972 (*Palmer*).) "Fixing the penalty for crimes is the province of the Legislature, which is in the best position to evaluate the gravity of different crimes and to make judgments among different penological approaches. [Citations.] Only in the rarest

of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive. [Citations.]" (*People v. Martinez, supra*, at p. 494.)

The California Supreme Court has "distilled three analytical techniques to aid [a court's] deferential review of excessiveness claims: (1) an examination of the nature of the offense and the offender, with particular attention to the degree of danger both pose to society; (2) a comparison of the punishment with the punishment California imposes for more serious offenses; and (3) a comparison of the punishment with that prescribed in other jurisdictions for the same offense. [Citations.]" (*Palmer, supra*, 10 Cal.5th at p. 973.) "Disproportionality need not be established in all three areas." (*People v. Norman* (2003) 109 Cal.App.4th 221, 230; accord, *People v. Avila* (2020) 57 Cal.App.5th 1134, 1145.)

Whether a sentence constitutes cruel and unusual punishment is a question of law. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1474.) A reviewing court therefore applies the de novo standard of review when determining whether a defendant's sentence is cruel and unusual. (*Ibid.*) However, "the underlying disputed facts must be viewed in the light most favorable to the judgment. [Citations.]" (*People v. Martinez, supra*, 76 Cal.App.4th at p. 496.)

### 3. Analysis

First, of the three analytical techniques identified by the California Supreme Court in reviewing an excessiveness claim, "[t]he main technique of analysis under California law is to consider the nature both of the offense and of the offender. [Citation.]" (*People v. Martinez, supra*, 76 Cal.App.4th at p. 494.) Regarding the offense, we consider it "both in the abstract and in the totality of circumstances surrounding its actual commission" (*ibid.*), including " 'motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts.' " (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510). Regarding the offender, we consider "the defendant's individual culpability, as shown by such factors as age,

prior criminality, personal characteristics, and state of mind. [Citations.]" (*People v. Martinez, supra*, 76 Cal.App.4th at p. 494.)

The offense of aggravated kidnapping for extortion with bodily injury is punishable by LWOP. (§ 209, subd. (a).) "The Legislature has chosen to make [some] offenses not involving homicide punishable by life imprisonment without possibility of parole. . . . Such sentences have been found not to constitute cruel or unusual punishment because the Legislature could reasonably decide that crimes which involve an inherent danger to the life of the victim are particularly heinous even if no death occurs." (*People v. Crooks* (1997) 55 Cal.App.4th 797, 807-808, fn. omitted (*Crooks*).)

Regarding kidnapping, there is a "long-standing, even ancient, horror of kidnapping." (*People v. Castillo* (1991) 233 Cal.App.3d 36, 66 (*Castillo*).) "By legislatively and judicially recognized contemporary standards, kidnaping is one of the most serious of all crimes. [Citations.]" (*In re Maston* (1973) 33 Cal.App.3d 559, 563 (*Maston*); accord, *Ordonez, supra*, 226 Cal.App.3d at p. 1228.) "By its very nature it involves violence or forcible restraint" (*Maston, supra*, at p. 563), and there is a recognition of the "the substantial risk to human life that it presents" (*Castillo, supra*, at p. 66).

An LWOP sentence for aggravated kidnapping is only available "where a person is held in order to force a payment of some kind to the perpetrator" (*Ordonez, supra*, 226 Cal.App.3d at p. 1227), such as kidnapping for "ransom, reward, or to commit extortion" (§ 209, subd. (a)). "[K]idnap for ransom, extortion or reward has . . . features that heighten the danger to the victim. '. . . Kidnapings for ransom are coldly planned, deliberate schemes. They are still endemic to the American scene.' [Citation.] . . . 'It has been pointed out by some that kidnapping for ransom inherently presents a combination of factors creating a substantial risk of bodily harm. In the ransom situation, "forcible control is necessary to effect secret confinement; the offense requires a protracted concealment; the confinement becomes more difficult to maintain when the

64

kidnapper's flight ultimately becomes necessary; and the victim's release grows increasingly dangerous with the passage of time." Accordingly, a demand for ransom generally involves an express or an implied threat of death or great bodily harm.' [Citations.] A kidnap for extortion or reward presents no lesser risk." (*Ordonez, supra*, at p. 1228.)

In addition, the severity of the penalty for kidnapping for ransom, reward, or extortion under section 209 is tied to the harm suffered by the victim. (See *Ordonez, supra*, 226 Cal.App.3d at p. 1226.) If the victim "suffers death or bodily harm, or is intentionally confined in a manner that exposes that person to a substantial likelihood of death," then the offense is punishable by LWOP. (§ 209, subd. (a).) If the victim does not suffer death or bodily harm, then the offense is punishable by imprisonment for life with the possibility of parole. (*Ibid.*) The purpose of the more severe penalty is " 'to deter the kidnaper from harming his [or her] victim, to induce him [or her] to release the victim unharmed.' [Citations.]" (*Ordonez, supra*, at p. 1226.) "Even if a death does not occur during these crimes the Legislature has determined they evidence such a flagrant disregard for the value of human life the perpetrator deserves a sentence of life without possibility of parole." (*People v. Thompson* (1994) 24 Cal.App.4th 299, 307.)

Here, defendant "readily admits" that the aggravated kidnapping of Smith for extortion and defendant's behavior in the commission of the offense were "serious" and that the offense involved the "infliction of injury." Notwithstanding this acknowledgement, defendant downplays the planning, the high level of violence, and the significant injury inflicted upon Smith, the kidnapping victim in count 1. As we have set forth above, the evidence reflects that defendant surveilled Barcinas at work before going to Barcinas's home with Zumbado. Defendant and Zumbado encountered Smith at the home when they knew Barcinas was at work. Defendant and Zumbado seized and confined Smith by ordering him into the garage at gunpoint. Smith was put on the floor of the garage, and his hands were tied. He was then brought to his bedroom,

again put on the floor (seemingly face down), and ordered to stay there. Upon Barcinas's and Lewis's arrival at the residence, defendant and Zumbado were able to violently confront them with Smith tied up in the bedroom. Defendant "smacked [Lewis] in the face with [the] barrel of his firearm," busting his lip open, and subsequently "rushed [Barcinas] from the side and forced [him] into the bathroom." When Smith untied himself and tried to hit defendant, defendant knocked Smith unconscious with a bat, fracturing his skull. Also in the course of the violence, Barcinas sustained a head injury requiring staples. Defendant used Smith's confinement to gain Barcinas's cooperation to open the safe. Specifically, with Smith (and Lewis) restrained or otherwise incapacitated, defendant threatened to shoot them unless Barcinas opened the safe. Guns, jewelry, and cash were ultimately taken from the safe.

Regarding defendant's individual culpability, he was 41 years old at the time of the incident. His prior criminal record included misdemeanor convictions and, significantly, a first degree robbery conviction arising out of an incident that occurred in late 2007, which was just a year and a half prior to the instant aggravated kidnappings and theft in 2009. In the earlier robbery, similar to the instant case, defendant and a coperpetrator confronted the victim at gunpoint when he arrived home. Defendant zip tied and duct taped the victim and his female companion. Defendant and the coperpetrator took $2,000 in cash.

Defendant contends that, in examining the nature of the offense and the offender (*Palmer*, *supra*, 10 Cal.5th at p. 973), this "factor neither favors nor disfavors" him because although he "acted in a dangerous manner in committing the instant offense, he is not a career criminal." Rather, according to defendant, outside of his offenses, he "was a useful member of the community," in view of his four-year service in the military and his employment record thereafter.

The Attorney General contends that defendant is the "most dangerous sort of person who deliberately creates situations with fatal potential, and then employs

66

instruments of deadly force, kidnapping, and extreme violence as tools to achieve even relatively modest financial gain. And, as reflected by his commission of both the [instant] and [earlier] home invasion events, [defendant] preferred to practice his life-threatening trade by invading the home sanctuaries of his victims and ambushing them at planned points of vulnerability. There is nothing disproportionate in a sentence that removes such a man from society, permanently."

Based on "an examination of the nature of the offense and the offender, with particular attention to the degree of danger both pose to society" (*Palmer, supra*, 10 Cal.5th at p. 973), we cannot agree with defendant that this "factor neither favors nor disfavors" him, and we agree with the Attorney General that "[t]here is nothing disproportionate" in the sentence. Defendant "was not an immature child at the time of the offence; rather, he was a [41]-year-old man who had some [military service] and had [apparently] been steadily employed in the past." (*Cole, supra*, 33 Cal.4th at p. 1235.) Although most of defendant's prior convictions were for misdemeanors, his most recent felony offenses reflect an increase in seriousness, violence, and harm to the victims. Specifically, the most recent incidents in 2007 and 2009 were planned home invasions with defendant and/or the coperpetrator having a weapon; the victims were restrained, incapacitated, and/or threatened with being shot; the apparent purpose of the offenses was material gain by defendant; and in the instant case, the victims were subjected to extreme violence by defendant, resulting in significant head injuries to two of the victims. " 'Fundamental notions of human dignity are not offended by the prospect of exiling from society those individuals who have proved themselves to be threats to the public safety and security.' " (*People v. Cooper* (1996) 43 Cal.App.4th 815, 826 (*Cooper*); see *Chacon, supra*, 37 Cal.App.4th at pp. 56, 57, 64 [LWOP sentence for aggravated kidnapping for ransom under § 209, subd. (a) was not cruel or unusual punishment, in view of the "heinous nature of the crime" and the defendants' "individualized culpability," where the defendants inflicted bodily harm on the kidnap victim and

67

threatened to kill her]; see also *People v. Martinez*, *supra*, 76 Cal.App.4th at p. 497 [lack of "significant prior criminal record" is "not determinative"].) Considering the nature of defendant's current offense and the offender, we cannot say that the punishment imposed is so disproportionate to the offense committed that it shocks the conscience and offends fundamental notions of human dignity. (*Mantanez*, *supra*, 98 Cal.App.4th at p. 358.)

Second, we are not persuaded by defendant's attempt to establish disproportionality based on his comparison of the punishment for aggravated kidnapping for extortion with bodily harm on the one hand, with the punishment California imposes for premeditated murder and for aggravated kidnapping for robbery on the other hand. (See *Palmer*, *supra*, 10 Cal.5th at p. 973.) Defendant observes that, whereas his conviction for aggravated kidnapping for extortion with bodily harm is punishable by LWOP, a defendant convicted of premeditated murder may be eligible for parole after serving 25 years. He also observes that, unlike his offense, kidnapping for robbery is punishable by life with the possibility of parole. (See § 209, subd. (b).)

Defendant's comparisons do not establish the disproportionality of his LWOP sentence. Regarding premeditated murder, "a person convicted of first degree murder is subject to the death penalty, life in prison without the possibility of parole, or a term of 25 years to life depending on the circumstances of the offense and the offender. (§ 190, subd. (a).) The maximum punishment [for first degree murder] is much greater than [defendant's] maximum punishment under section [209, subdivision (a) for aggravated kidnapping for extortion with bodily injury]." (*Cooper*, *supra*, 43 Cal.App.4th at p. 826.) Regarding defendant's comparison of the punishment for aggravated kidnapping for extortion with bodily injury versus aggravated kidnapping for robbery, one court has observed that kidnappings for ransom, which is encompassed in the same Penal Code provision as kidnappings for extortion (§ 209, subd. (a)), "are coldly planned deliberate schemes" while kidnappings for robbery "often involve far less deliberation." (*Maston*, *supra*, 33 Cal.App.3d at p. 563.) Another court has stated that the difference in penalty

68

may be "rooted in the common (though not essential) involvement of multiple victims—primary and secondary—in kidnappings for extortion." (*Ibrahim*, *supra*, 19 Cal.App.4th at p. 1699.) We are therefore not persuaded by defendant's contention that aggravated kidnapping for robbery is necessarily more serious than aggravated kidnapping for extortion. Moreover, "[t]he Legislature has chosen to make [some] offenses not involving homicide punishable by life imprisonment without possibility of parole: kidnapping for the purpose of ransom[ or] extortion . . . with bodily harm short of death (§ 209, subd. (a)) and attempted train wrecking (§ 218). Such sentences have been found not to constitute cruel or unusual punishment because the Legislature could reasonably decide that crimes which involve an inherent danger to the life of the victim are particularly heinous even if no death occurs. [Citations.]" (*Crooks*, *supra*, 55 Cal.App.4th at pp. 807-808, fn. omitted.) An LWOP sentence in this context "serves a rationally conceived penal purpose. Despite anomalies in the structure of surrounding laws, the penalty is not disproportionate by the standards of internal California comparisons." (*Maston*, *supra*, 33 Cal.App.3d at p. 565; see also *Castillo*, *supra*, 233 Cal.App.3d at p. 66.)

Third, regarding a comparison of the punishment in California for the same offense in other jurisdictions (*Palmer*, *supra*, 10 Cal.5th at p. 973), defendant "concedes that at least three other states have comparable punishments," including Oklahoma, Louisiana, and West Virginia, and that Oklahoma in particular allows for death. The Attorney General identifies two additional states – Georgia and Florida – with similar punishment as California. Moreover, even if "California's punishment scheme [was] among the most extreme does not compel the conclusion that it is unconstitutionally cruel or unusual. This state constitutional consideration does not require California to march in lockstep with other states in fashioning a penal code. It does not require 'conforming our Penal Code to the "majority rule" or the least common denominator of penalties

nationwide.' [Citation.] Otherwise, California could never take the toughest stance . . . ." (*People v. Martinez*, *supra*, 71 Cal.App.4th at p. 1516.)

Accordingly, we conclude that defendant's LWOP sentence, imposed for aggravated kidnapping for extortion with bodily injury, does not violate the state prohibition against cruel and unusual punishment.

## J. *Sentencing Issues and the Abstract of Judgment*

### 1. **Sentence for the Orange County Case**

Defendant was sentenced in the instant case and the Orange County robbery case at a combined sentencing hearing and, later, at a resentencing hearing. On appeal, defendant contends that the trial court intended for the determinate sentences in the instant case and in the Orange County case to run concurrent to the indeterminate sentence in the instant case. He argues that the court instead improperly designated the enhancements for the indeterminate terms on counts 1 and 2 in the instant case as the principal term and then imposed one-third the midterm for the Orange County case. Defendant contends that the trial court should be directed to "correct" the abstracts of judgment "to reflect the lawful sentence that the court intended to impose."

The Attorney General concedes that the "the trial court should not have incorporated the determinate Orange County sentence into the indeterminate portion of the" sentence in the instant case. The Attorney General argues that "[r]emand is necessary, however, to permit the trial court to exercise its discretion in fashioning a determinate term sentence."

On March 10, 2020, the trial court initially sentenced defendant in the instant case to LWOP on count 1 plus thirteen years for sentence enhancements; a consecutive life term on count 2 plus six years for sentence enhancements; and concurrent determinate terms of three years each plus ten years each for sentence enhancements on counts 3 through 6. The court imposed a full-term consecutive sentence of nine years for the

70

Orange County case in which defendant was convicted of first degree robbery in concert in 2017.

Defendant filed a motion to correct the sentence. He contended that the trial court was required to select thirteen years as the principal term in the instant case (apparently based on count 3, 4, 5, or 6) and then impose one-third the middle term, or two years, for the Orange County case pursuant to section 1170.1, subdivision (a).

At a resentencing hearing on November 12, 2020, the trial court stated that the instant case had the "longer term, so it should be the primary sentence with the [Orange County] case being the subordinate sentence." The prosecutor contended the "primary term" in the instant case "would be 19 years" for the enhancements on counts 1 and 2, rather than the concurrent 13-year term imposed on each of counts 3 through 6 as contended by defendant. The trial court agreed with the prosecutor and purported to select the 19 years in enhancements on counts 1 and 2 as the principal term, and then modified defendant's sentence in the Orange County case to a consecutive term of two years, which was one-third the midterm, for an "aggregate determinate term" of 21 years. The court then stated, "Everything else I did regarding concurrent sentences is going to remain the same. That was the only consecutive that the Court needed to address."

Defendant's overall sentence includes both determinate terms and indeterminate terms. "Indeterminate term crimes and determinate term crimes are subject to two different sentencing schemes." (*People v. Neely* (2009) 176 Cal.App.4th 787, 797 (*Neely*).) "Sentencing under these two sentencing schemes must be performed separately and independently of each other. [Citation.] Only after each is determined are they added together to form the aggregate term of imprisonment." (*Ibid.*)

Regarding determinate terms, the trial court "select[s] a base term for each of the crimes, set[s] the crime with the greatest base term as the principal term, impose[s] the full base term as the sentence for the principal term crime, and impose[s] one-third of the middle term as a consecutive sentence for any subordinate term crimes. Should the court

71

choose to run one or more of the determinate terms concurrently, it would impose the full selected base term and order it to be served concurrently with the principal term." (*Neely*, *supra*, 176 Cal.App.4th at pp. 798-799; see § 1170.1, subd. (a).)

"[S]traight life sentences" are considered indeterminate sentences. (*People v. Felix* (2000) 22 Cal.4th 651, 658 (*Felix*).) Indeterminate sentences "are not subject to section 1170.1." (*Neely*, *supra*, 176 Cal.App.4th at p. 798.) "Consequently there are no principal and subordinate terms to be selected. [Citation.] The court simply imposes the statutory term of imprisonment for the indeterminate sentence crime . . . ." (*Ibid.*) Likewise, if an enhancement is attached to more than one indeterminate term, those enhancements must be imposed for their full term. (*Felix*, *supra*, at p. 656.) "[S]ection 1170.1's one-third limit for consecutive subordinate terms and enhancements does not apply." (*Ibid.*)

"Life sentences, whether with or without the possibility of parole, may be imposed to run consecutively with one another, with any term imposed for applicable enhancements, or with any other term of imprisonment for a felony conviction. Whenever a person is committed to prison on a life sentence which is ordered to run consecutive to any determinate term of imprisonment, the determinate term of imprisonment shall be served first . . . ." (§ 669, subd. (a).)

"Once the court determines what sentence is to be imposed for the indeterminate term offenses and the determinate term offenses, it combines the two to reach an aggregate total sentence. Nothing in the sentencing for the determinate term crimes is affected by the sentence for the indeterminate term crime." (*Neely*, *supra*, 176 Cal.App.4th at p. 798.)

In this case, at the resentencing hearing, the trial court "failed to sentence [defendant] for crimes punishable by imposition of determinate terms separately from the crimes punishable by imposition of an indeterminate term." (*Neely*, *supra*, 176 Cal.App.4th at p. 797.) "Specifically, the court erroneously applied the principal

72

term/subordinate term methodology set forth in section 1170.1 to all of the offenses. When it imposed a consecutive one-third of the middle term sentence for the [Orange County] robbery, the court in effect was designating the [aggravated kidnappings, which have indeterminate terms,] as the principal term under section 1170.1." (*Ibid.*)

"To permit correction of the trial court's errors, the case must be remanded for resentencing. Moreover, because the trial court misapplied the sentencing rules for crimes subject to different sentencing schemes, the trial court must be given the opportunity to revise all of its discretionary sentencing choices for the determinate term crimes. [Citation.]" (*Neely*, *supra*, 176 Cal.App.4th at p. 799.) The trial court's discretion on remand will include "whether to impose consecutive or concurrent sentences for each of the crimes as permitted by law" and "whether the aggregate determinate term will run concurrently with or consecutively to the indeterminate term." (*Ibid*.) In this regard, we disagree with defendant that the record clearly shows that the trial court intended to run the Orange County sentence concurrent to the indeterminate sentence in the instant case. To the contrary, the record reflects that at both the initial sentencing and at resentencing, the trial court sought to run the Orange County sentence consecutive. We will remand for resentencing to allow the trial court to properly exercise its discretion.

### 2. Prior Serious Felony Enhancement

In a footnote regarding sentencing issues, the Attorney General contends that the "trial court neglected to impose mandatory consecutive five-year serious felony prior enhancements on [c]ounts 1 and 2 in view of [defendant's] prior robbery conviction" in the Orange County case. (See § 667, subd. (a).) Because the Orange County robbery conviction was "prove[n]" at trial, the Attorney General argues that this court "should order that sentencing oversight corrected on remand."

As defendant points out in reply, however, the enhancement must be pleaded before it may be imposed. (§ 1170.1, subd. (e) ["All enhancements shall be alleged in

the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact"].) No prior serious felony enhancement was pleaded in this case, and therefore the enhancement may not be imposed. (*People v. Nguyen* (2017) 18 Cal.App.5th 260, 270 [concluding that "the trial court erred by imposing the unpleaded five-year prior serious felony conviction enhancement"]; see also *People v. Jackson* (1985) 37 Cal.3d 826, 835, fn. 12 [noting that before a prior serious felony enhancement under § 667 may be imposed by a trial court, the defendant must "receive notice of the facts the prosecution intends to prove"].)

### 3. Additional Custody Credits for Actual Time in Custody

Defendant contends that he is entitled to an additional 247 days of custody credit for actual time in custody between his initial sentencing on March 10, 2020, and the resentencing on November 12, 2020. The Attorney General contends that defendant is not entitled to presentence custody credits for this period of time. As we are remanding the matter for resentencing, the parties may raise this issue for the trial court to address in the first instance.

### 4. Abstract of Judgment

Defendant and the Attorney General contend that there are multiple errors in the abstracts of judgment for the indeterminate and determinate terms, including that count 3 is completely missing and that the abstract containing counts 1 and 2 does not include the associated enhancements. Because this case must be remanded for resentencing and amended abstracts will need to be prepared, the parties may raise the issues with the trial court to consider in the first instance.

### K. *Restitution*

Defendant contends that, due to a mathematical error, the trial court incorrectly awarded victim restitution to Barcinas in the amount of $26,364.77 and that the correct amount is $26,358.77. The Attorney General concedes the error. We find the concession appropriate.

74

The prosecutor submitted a written request for victim restitution for Barcinas. In the written request, the prosecutor explained that defendant's coperpetrator, Zumbado, had been ordered to pay Barcinas $26,791.76 in victim restitution. The prosecutor explained that defendant should be ordered to pay the same amount of victim restitution to Barcinas, except that $432.99 should be subtracted from the restitution to Barcinas for a stolen firearm that actually belonged to victim Smith, not Barcinas. In doing this subtraction ($26,791.76 minus $432.99), the prosecutor incorrectly requested $26,364.77, instead of the mathematically correct amount of $26,791.76 in restitution for Barcinas.

At the restitution hearing, the parties and the trial court agreed that defendant should and would be ordered to pay the same amount of restitution that his coparticipant had been ordered to pay, less $432.99. Apparently relying on the incorrect figure listed in the prosecutor's written request, the court ordered that defendant pay Barcinas $26,364.77 in restitution.

As it is apparent from the record that the mathematically correct amount of restitution to Barcinas is $26,358.77, we will order the restitution order corrected.

## IV. DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court with directions to (1) strike the convictions on counts 4, 5, and 6 for grand theft; (2) correct the restitution order to Danny Barcinas to $26,358.77; and (3) resentence defendant consistent with this opinion, including regarding selecting principal and subordinate terms and regarding concurrent and consecutive sentencing.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.


WE CONCUR:


_____
DANNER, J.


_____
WILSON, J.


*People v. Melody*
**H047978**
**H048612**
**H048638**